In re GLENVIEW IMPORTS, LTD., an Illinois corporation,

Eugene CRANE, Predecessor Trustee of Glenview Imports, Ltd., Plaintiff,

v.

Robert E. TAMBOURINE, Trustee; Small Business Admin.; Oak Trust & Savings Bank; Wheeling Trust & Savings Bank; and Old Orchard Bank & Trust, Defendants.

Thomas E. RALEIGH, Trustee, Plaintiff/Counter-defendant,

v.

Robert E. TAMBOURINE and Trans-America Insurance Company, Defendants/Counter-plaintiffs.

Bankruptcy No. 79 B 41910.
Nos. 80 A 0040, 81 A 0087.

United States Bankruptcy Court, N.D. Illinois, E.D.

Feb. 16, 1983.

Thomas W. Drexler, Chicago, Ill., for plaintiff.

Abraham Brustein, Dozoryst & Brustein, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

FREDERICK J. HERTZ, Bankruptcy Judge.

This controversy involves two interrelated complaints. With the consent of the parties, this court will consolidate the disposition of these complaints in order to further judicial economy.

In December, 1979, Glenview Imports, Ltd. (hereinafter referred to as debtor) filed a petition under Chapter 7 of the Bankruptcy Code. Eugene Crane was appointed as interim trustee. The debtor, a corporation, was in the business of rehabilitating damaged foreign automobiles for resale to the public.

Early in this proceeding, American National Bank as Trustee of Trust No. 27567 (hereinafter referred to as the Bank), the lessor of the debtor's business premises, claimed that the debtor had defaulted on its lease payments. Accordingly, the Bank

sought to remove the debtor's personal property from the leased premises so that the premises could be re-let. This court granted the Bank's request, and the debtor's personalty was removed and stored by Modern Auctioneers, Inc.

On January 11, 1980, Mr. Crane sought leave to sell at public auction certain property of the debtor.[1] Mr. Crane stated that the only lien claims against the property, as best as he could ascertain, were those of the Small Business Administration and Robert E. Tambourine, Trustee. The amounts and validity of these liens were uncertain.

Robert E. Tambourine (hereinafter referred to as Tambourine) is the individual primarily responsible for managing the debtor's business, but he is not an officer, director, or shareholder of the debtor. Tambourine also is the Trustee of a trust agreement (hereinafter referred to as the Tambourine Trust) between the debtor, as Grantor, and Marjorie S. Bransfield and his four sons (Roy, Richard, Robert J., and Ronald Tambourine), as Beneficiaries.[2] The four sons are the officers and shareholders of the debtor. Marjorie Bransfield, however, is neither a relative of the Tambourine's nor an officer or shareholder of the debtor.

In response to Mr. Crane's application, this court ordered that anyone objecting to the sale must show cause by January 24, 1980, why the sale scheduled for January 26, 1980 should not be commenced. At the hearing on January 24, 1980, Tambourine, as Trustee of the Tambourine Trust, was the only party to object. The basis for his objection was that the purported lien of the Tambourine Trust would be irreparably harmed since the proposed auction sale would realize an amount significantly less

than that of a sale in the normal course of business. Tambourine also claimed that the interim trustee had no interest in the debtor's property because the property was oversecured by the lien of Tambourine Trust. Noting that a delay in the scheduled sale would cause undue harm and expense to the debtor's estate, this court ordered that the January 26, 1980 sale be stayed only in the event that Tambourine, as Trustee, post a bond in the amount of $15,000.00 and that "said bond shall be for the purpose of indemnifying the Trustee [Mr. Crane] or this estate from any loss that may result from staying the above sale." Tambourine, as Trustee, filed an injunction bond (with Transamerica Insurance Company as surety) in the amount of $15,000.00 on January 25, 1980, and the sale was stayed.

In addition to the application filed on January 11, 1980, Mr. Crane also filed a complaint, 80 A 0040, seeking to declare his interest in the debtor's automobiles to be superior to that of Tambourine, as Trustee. While this complaint did not specifically refer to identified automobiles, Tambourine's answer and counterclaim asserted a security interest in favor of the Tambourine Trust in thirty-four (34) identified vehicles.

On February 7, 1980, this court granted the debtor's application to convert the case from a Chapter 7 to a Chapter 11 proceeding. Mr. Crane was formally discharged as interim trustee on June 5, 1980, when he filed his "Interim Trustee and Trustee's Final Report and Account." Complaint 80 A 0040, however, continued to remain viable despite the conversion of the bankruptcy proceeding. During the pendency of the Chapter 11, the debtor held, subject to the alleged security interest of the Tambourine Trust, five substantially rehabilitated auto-

---

1. The debtor's property consisted of five identified automobiles, office furniture, garage equipment, and other miscellaneous property.

2. The trust agreement, dated August 2, 1976, states, *inter alia,* that the Beneficiaries have made loans to the Grantor and that the Beneficiaries "have secured themselves for said loans and future advances to titles to automobiles owned or held by the Grantor." The agreement also provides: "The Grantor hereby

agrees to deliver to the Trustee all titles to automobiles now in its possession and control to the Trustee and all such titles to which it shall subsequently acquire, own, hold or possess so long as the Beneficiaries shall be creditors of the Grantor." Other provisions detail the duties of both the Trustee and the Beneficiaries. The agreement is signed by the five Beneficiaries and the Trustee, but it is not signed by anyone on behalf of the Grantor.

mobiles, thirty-four automobiles with varying amounts of damage, and miscellaneous automobile parts. The proceeds from the debtor's business during the Chapter 11 were used to pay current costs of administration.

The Chapter 11 proceeding continued until October 8, 1980, when this court granted the Bank's motion to convert the case back to a Chapter 7 proceeding. The basis for the bank's motion was that (1) the debtor-in-possession had failed to pay the Bank $10,300.00, as per court order of June 2, 1980, (2) the debtor's operation had continued to incur losses, resulting in a further depletion of the debtor's assets, and (3) no plan of reorganization had been filed. Thomas E. Raleigh was appointed as the successor interim trustee. Upon conversion back to Chapter 7, the debtor's assets at salvage value were worth $500.00 or less.

On January 9, 1981, Mr. Raleigh, as successor interim trustee, filed complaint 81 A 0087, seeking damages as a result of the wrongful issuance of the injunction bond posted by Tambourine, as Trustee, which stayed the January 26, 1980 sale. The complaint alleged that the damages stemmed from additional administrative expenses[3] and a diminution of the assets of the estate,[4] which occurred during the pendency of the Chapter 11. The complaint named Tambourine, individually, and Transamerica Insurance Company (the surety on the bond) as being jointly and severally liable.

The answer and affirmative defense to complaint 81 A 0087 denied any liability stemming from the bond and indicated that, in any event, Tambourine was not individually liable under the terms of the bond. In addition, Tambourine and Transamerica filed a counterclaim against Mr. Raleigh, as successor interim trustee, for breach of the duty to properly administer the debtor's estate, claiming $30,000.00 in damages. Mr. Raleigh denied any liability in his answer to the counterclaim.

On July 21, 1982, this court held an evidentiary hearing at which Tambourine testified. Subsequently, both parties have prepared proposed findings of fact and conclusions of law, memoranda of law, and a joint pre-trial memorandum and stipulation. Oral argument was heard on January 6, 1983.

This controversy centers on the ability to recover damages for the alleged wrongful issuance of the bond staying the January 26, 1980 sale. Federal Rule of Civil Procedure 65(c) provides:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant...for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Thus, there are two elements for recovery on an injunction bond: (1) wrongful issuance of the bond and (2) damages resulting directly from such issuance. *See* Comment, *The Triggering of Liability on Injunction Bonds,* 52 N.C.L.Rev. 1252, 1257 (1974).

A bond is wrongfully issued when there is no adequate basis for staying the activity or individual in question. *See American Bible Society v. Blount,* 446 F.2d 588, 594–95 (3d Cir.1971) ("No liability can arise on an injunction bond unless there is a final judgment in favor of the party enjoined."); *Silvers v. TTC Industries, Inc.,* 395 F.Supp. 1318, 1322 (E.D.Tenn.1974)

---

**3.** The Bill of Particulars filed by Mr. Raleigh indicated that the expenses directly related to the stay of the January 26, 1980 sale were (a) $2,434.51 due to the Bank as a per diem rental from January 25, 1980 to February 7, 1980 (the date of the conversion to Chapter 7), (b) $10,-300.00 due to the Bank as rental per court order from February 7, 1980 to March 30, 1980 (the date the premises were vacated), and (c) $375.00 to Modern Auctioneers for the cost of

returning certain merchandise to the debtor's premises.

**4.** The Bill of Particulars also alleged that if the sale had taken place on January 26, 1980, the sale proceeds would have been at least $25,-000.00. Since the value of the debtor's assets after the Chapter 11 was $500.00 or less, the estate lost $24,500.00, which would have been available for the cost of administration and distribution.

("For the purpose of establishing liability on this injunction bond, this Court's judgment of December 28, 1970, dismissing the defendant's-by-cross claim's bill in equity, constituted a judicial determination that the injunction herein should not have been granted."); *U.S. Steel Corp. v. United Mine Workers of America,* 317 F.Supp. 1070, 1072 (W.D.Pa.1970), *reh'g denied* 320 F.Supp. 748, *rev'd on other grounds,* 456 F.2d 483 (3d Cir.1972) ("It is the generally followed federal rule that there can be no recovery of damages caused by a preliminary injunction even if set aside, unless final judgment after trial is in the favor of the party who has been enjoined.")

In support of a finding that the bond staying the auction sale scheduled for January 26, 1980 was wrongfully issued, Mr. Raleigh, adopting the allegations contained in complaint 80 A 0040, initially argues that the Tambourine Trust had no interest in the automobiles to be sold because the trust agreement was invalid due to improper execution. Specifically, it is claimed that the trust agreement was defective because it was not signed by anyone on behalf of the debtor, the Grantor under the trust. *See* note 2 supra. Tambourine's position is that execution did not affect the validity of the trust agreement, especially since all parties to the agreement relied upon it.

 Under Illinois law, a trust in personal property may be created orally, without the use of a written instrument. *People v. Schaefer,* 266 Ill. 334, 339, 107 N.E. 617, 619 (1915) ("A trust in personal property may be created and proved by parol.") Since the Tambourine Trust involves only personalty (i.e. automobiles), the failure for someone on behalf of the debtor to sign the trust agreement does not render the Tambourine Trust invalid.

 Illinois law, however, does provide that the grantor of a trust must transfer to the trustee either possession of, or title to, the property to be held by the trustee for the benefit of the beneficiaries. As stated by the court in *Ridgway v. McCartney,* 57 Ill.App. 453 (1st Dist.1894), *aff'd* 160 Ill. 129, 43 N.E. 826 (1895):

The distinction between such declaration of trust and a mere statement that the donor gives, sets apart or settles property upon another, is obvious.

The legal title being in him, the donor has to complete his gift, but to declare that he holds the property in trust for another to whom he gives the use. A perfected trust is thus created; but if the owner do merely declare that he gives, sets apart and settles, without making delivery of possession or transfer of title, no trust is created; *in order to perfect a trust it is necessary that he do more; that he surrender possession, or in an appropriate manner transfer the legal title to some one who is to hold it for the donee.*

*Id.* at 467–68 (emphasis added). Although the terms of the Tambourine Trust Agreement provide that the titles to the debtor's automobiles should be transferred to the trustee, there has been no evidence introduced before this court which indicates that this was ever done. According to Exhibits B and C attached to Tambourine's answer to complaint 80 A 0040, Tambourine, as Trustee, was not listed as the title holder on any of the 34 automobiles reported in those exhibits. Instead, Tambourine, as Trustee, is listed as a lienholder on many of these titles. In fact, Tambourine testified that the titles to the automobiles were always kept in the debtor's name. Since it appears that the titles to the debtor's automobiles were never transferred to Tambourine, as Trustee, in compliance with the trust agreement, this court holds that the Tambourine Trust is invalid.

Notwithstanding the alleged invalidity of the Tambourine Trust, Mr. Raleigh also argues that the stay was wrongfully issued because the Tambourine Trust had no interest in the debtor's automobiles due to improperly perfected security interests. It is claimed that the necessary financing statements were not filed in accordance with the Uniform Commercial Code, as adopted in Illinois, Ill.Rev.Stat. ch. 26, § 9–101 *et seq.* (1981), and the Illinois Vehicle Code, Ill.Rev. Stat. ch. 95½, 3–201(c) (1981). Although

admitting that financing statements were not filed, Tambourine claims that a financing statement is not required in order to perfect a security interest in an automobile in Illinois.

Generally, under Illinois law, the Uniform Commercial Code governs the acquisition of a security interest in personal property. The Illinois Vehicle Code, however, exclusively controls the creation of a security interest in a motor vehicle. *See In re Keidel,* 613 F.2d 172, 173 (7th Cir.1980); *Huber Pontiac, Inc. v. Wells,* 59 Ill.App.3d 14, 17, 16 Ill.Dec. 518, 521, 375 N.E.2d 149, 152 (1978). Accordingly, Section 3–202(a), (b) of the Illinois Code provides:

### PERFECTION OF SECURITY INTEREST

(a) Unless excepted by Section 3–201, a security interest in a vehicle of a type for which a certificate of title is required is not valid against subsequent transferees or lienholders of the vehicle unless perfected as provided in this Act.

(b) A security interest is perfected by the delivery to the Secretary of State of the existing certificate of title, if any, an application for a certificate of title containing the name and address of the lienholder and the date of his security agreement and the required fee. It is perfected as of the time of its creation if the delivery is completed within 21 days thereafter, otherwise as of the time of delivery.

Ill.Rev.Stat. ch. 95½, § 3–202(a), (b) (1981).

As indicated in Section 3–202(a), Section 3–201 lists certain transactions in which the Illinois Vehicle Code does not control the means of perfecting a security interest. Section 3–201 provides in part:

### EXCEPTED LIENS AND SECURITY INTERESTS

This Article does not apply to or affect:

. . . . .

(c) A security interest in a vehicle created by a manufacturer or dealer who holds the vehicle for sale, but a buyer in the ordinary course of trade from the manufacturer or dealer takes free of the security interest.

Ill.Rev.Stat. ch. 95½, § 3–201(c) (1981).

In the case at bar, Tambourine, as Trustee, claims to have a security interest in all of the debtor's automobiles. In Tambourine's answer and counterclaim to complaint 80 A 0040, and the exhibits thereto, Tambourine describes the security interest of the Tambourine Trust in 34 of the debtor's automobiles as follows:

—10 automobiles with Illinois titles in the name of the debtor, with Robert E. Tambourine, Trustee, as lienholder.

—9 automobiles with Illinois titles with previous owners on the front of the titles and assignments to the debtor, with Robert E. Tambourine, Trustee, as lienholder.

—10 out-of-state titles.

—5 Illinois titles in the name of the debtor.

Tambourine's answer and counterclaim to complaint 80 A 0040, also states that the debtor, in accordance with the terms of the Tambourine Trust agreement, gave this security interest in consideration for loans in excess of $95,000.00 by the Beneficiaries of the Tambourine Trust.

The nature of these transactions is similar, if not identical, to floor plan financing, where a loan is made to an automobile dealer (for the purchase of cars or other items) in consideration for a security interest in the dealer's automobiles. *See Harlan v. U.S.,* 312 F.2d 402, 406 (Ct. Claims 1963). This type of transaction is distinguishable from a transaction where an automobile dealer in the normal course of business sells an automobile to a consumer, with a security interest being given to a third party who financed the consumer's purchase.

In this court's opinion, the later type of transaction (i.e. a retail sale in the ordinary course of business to a consumer) is the transaction to which Section 3–202 applies, requiring filing with the Secretary of State to perfect a security interest. *See In re Keidel,* 613 F.2d 172 (7th Cir.1980) (Illinois

Vehicle Code governs creation of security interest in a mobile home where bank financed the sale to the consumer); *Huber Pontiac, Inc. v. Wells,* 59 Ill.App.3d 14, 16 Ill.Dec. 518, 375 N.E.2d 149 (4th Dist.1978) (Illinois Vehicle Code, not Uniform Commercial Code, governs the creation of a security interest in an automobile where bank financed sale by dealer to consumer). It is the former type of transaction (i.e. floor plan financing) which meets the definition provided in Section 3–201(c) as "a security interest in a vehicle created by a manufacturer or dealer who holds the vehicle for sale...."[5] Since by application of Section 3–201(c) the Illinois Vehicle Code does not apply to floor plan financing, this court holds that the Uniform Commercial Code governs perfection of a security interest in the case at bar.

■ Under Section 9–302 of the Uniform Commercial Code as adopted in Illinois, a financing statement must be filed in order to perfect a security interest, unless the transaction is expressly excepted. Ill.Rev. Stat. ch. 26, § 9–302 (1981). The parties to this controversy have not argued that this transaction comes within one of the enumerated exceptions contained in the Illinois statute, and this court does not find any applicable exception. Since Tambourine has admitted that no financing statements were filed, this court holds that the alleged security interests of the Tambourine Trust is invalid and that the alleged security interests of the Tambourine Trust were not properly perfected.

■ Since this court has found that the Tambourine Trust is invalid and that the alleged security interests of the Tambourine Trust are not properly perfected, this court holds that, under complaint 80 A 0040, the rights of the interim trustee in the debtor's automobiles are superior to those of the Tambourine Trust. Accordingly, the Tambourine Trust's counterclaim to declare its interests to be superior to those of the interim trustee is defeated. Consequently, this court also holds that there was no adequate basis for staying the auction sale scheduled for January 26, 1980.

■ By finding that the injunction staying the January 26, 1980 sale was wrongful-

---

**5.** This court has been unable to find any Illinois case law addressing the perfection of a security interest in an automobile pursuant to a floor plan financing agreement. The most persuasive case law addressing this specific situation stems from the State of Georgia.

The Georgia Motor Vehicle Certificate of Title Act contains a provision which is substantively identical to Section 3–201(c) of the Illinois Vehicle Code. The Georgia statute provides:

This Chapter does not apply to or affect a security interest in a vehicle created by a manufacturer or dealer who holds the vehicle for sale, but a buyer in the ordinary course of trade from the manufacturer or dealer takes free of the security interest.

Ga.Code Ann. § 68–405a (1961).

The Georgia courts have held that a security interest resulting from a floor plan financing agreement comes within the terms of the statutory provision. Accordingly, by operation of this provision, this type of security interest is excluded from the control of the Georgia Motor Vehicle Certificate of Title Act.

*Rome Bank and Trust Co. v. Bradshaw,* 143 Ga.App. 152, 237 S.E.2d 612 (1977) is one of the Georgia court decisions in support of this line of reasoning. The court in *Bradshaw* stated:

In a long series of holdings this court has recognized the clear command of the legislature as set out in Code Ann. § 68–405a that floor-planned vehicles held in inventory for sale by a dealer are not controlled by the Georgia Motor Vehicle Certificate of Title Act.

As succinctly stated in *Guardian Discount Co. v. Settles,* 114 Ga.App. 418, 421(3), 151 S.E.2d 530: "The Motor Vehicle Certificate of Title Act ... has no application where the security interest is created by a manufacturer or a dealer." Accord: *Dunford v. Columbus Auto Auction,* 114 Ga.App. 407(1), 151 S.E.2d 464. In *First Nat. Bank & Trust Co. v. Smithloff,* 119 Ga.App. 284, 287, 167 S.E.2d 190, we pointed out that, where there is floor-planning of a vehicle perfection of a security interest in inventory would come under the Commercial Code and as to such security interest created by a dealer priority would be governed by Ga.U.C.C. § 109A–9–307 (Code Ann. § 109A–9–307; Ga.L.1962, pp. 156, 404, as amended), and Code Ann. § 68–405a. Accord: *Staley v. Phelan Finance Corp.,* 116 Ga.App. 1, 2, 156 S.E.2d 201; *First Nat. Bank, etc. v. McElmurray,* 120 Ga.App. 134, 139(4), 169 S.E.2d 720.

237 S.E.2d at 614–15.

ly issued, this court must now decide what damages, if any, have resulted directly from this injunction. Compensable damages are those which actually and proximately result from the wrongfully issued injunction. *Osage Oil & Refining Co. v. Chandler,* 287 F. 848, 851 (2d Cir.1923) ("The general principles for measuring damages ordinarily apply in actions for wrongfully suing out injunctions; and the damages allowed are those which are the actual, natural, and proximate result of the wrong committed."). *Accord Grant v. Smith,* 574 F.2d 252, 256 (5th Cir.1978).

Mr. Raleigh claims that the debtor's estate sustained the following damages:

(1) $2,434.51 in rent from January 25, 1980 to February 7, 1980;

(2) $10,300.00 in rent from February 7, 1980 to March 30, 1980;

(3) $375.00 moving expense to return the items which were to be sold; and

(4) $24,500.00 in proceeds which would have resulted from the sale if the sale would have proceeded as scheduled.

*See* notes 3, 4 *supra.* Tambourine's position is that (1) the amount claimed for lost sale proceeds is speculative because there has been no evidence as to the amount which would have been realized on the sale and (2) the other amounts claimed are inappropriate because the conversion from a Chapter 7 to a Chapter 11 on February 7, 1980 made any recovery on the bond moot, since it was impossible to conduct a sale after this time.

■ Although there may have been some loss in sale proceeds resulting from staying the January 26, 1980 sale, this court finds that Mr. Raleigh has failed to establish with reasonable accuracy the extent of that loss. There is no evidence as to how Mr. Raleigh arrived at $25,000.00 as the value of the property to be sold. Moreover, while Tambourine testified that he believed the value of the debtor's property to be $40,000.00 or $50,000.00 during January or February of 1980, it appears that this testimony was referring to all of the debtor's property, not the specific items to be sold on January 26, 1980. Although the staying of the January 26, 1980 sale may have dis-

couraged the sale of the rest of the debtor's property, this court finds that diminution of the debtor's assets as a result of operating losses during the pendency of its Chapter 11 was not directly related to the injunction. Therefore, this court holds that, under the evidence presented, no damages can be awarded on the basis of lost sale proceeds.

■ As to the damages for rent from January 25, 1980 to February 7, 1980 and from February 7, 1980 to March 30, 1980, this court holds that these expenses did not proximately result from the injunction. Since the January 26, 1980 sale involved only a portion of the debtor's assets, *see* note 1 *supra,* the debtor would have incurred rental expenses whether or not the sale took place. Moreover, it does not appear that the debtor's rental expense would have decreased but for staying the sale.

■ While the debtor had the right to convert this proceeding from a Chapter 7 to a Chapter 11, 11 U.S.C. § 706 (1979), it does not necessarily follow that all claims for damages resulting from the injunction have become moot. But for the issuance of the injunction, the debtor's estate would not have incurred $375.00 in moving expenses to return the property involved in the scheduled sale. Thus, this court holds that, under complaint 81 A 0087, Transamerica Insurance Company, as surety on the injunction bond, is liable for $375.00 in damages stemming from the wrongful issuance of the injunction staying the January 26, 1980 sale.

■ As to the counterclaim to complaint 81 A 0087, Tambourine has not presented any evidence to show that Mr. Raleigh, as successor interim trustee, breached his duty to properly administer the debtor's estate. Moreover, this court has not found any facts supporting this assertion. Consequently, this court holds that the counterclaim to complaint 81 A 0087 is denied.

Mr. Raleigh, as successor interim trustee, is to prepare a draft order in accordance with this opinion within five (5) days.