972 F.2d 738
 141 L.R.R.M. (BNA) 2092, 122 Lab.Cas. P 10,307
 TILE, MARBLE, TERRAZZO, FINISHERS, SHOPWORKERS AND GRANITE
CUTTERS INTERNATIONAL UNION, AFL-CIO, and United
Brotherhood of Carpenters and Joiners of
America,
Plaintiffs-
Appellants,
Cross-Appellees,
v.
CERAMIC TILE FINISHERS UNION, LOCAL 25, a/w Tile, Marble,
Terrazzo, Finishers, Shopworkers and Granite Cutters
International Union, AFL-CIO, Robert Douglas,
Secretary-Treasurer, Joseph Willekens, President, et al.,
Defendants-Appellees, Cross-Appellants.
 Nos. 90-3101, 90-3189.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 8, 1992.
Decided Aug. 11, 1992.
 
 Sherman Carmell, David Mathews (argued), Carmell, Charone, Widmer, Mathews & Moss, Chicago, Ill., Joseph J. Pass, Jubelirer, Pass & Intrieri, Pittsburgh, Pa., for plaintiffs-appellants.
 Marvin Gittler, Barry M. Bennett (argued), Asher, Gittler, Greenfield, Cohen & D'Alba, Lawrence J. Weiner, Scariano, Kula, Ellch & Himes, Chicago, Ill., for defendants-appellees.
 Before CUMMINGS and RIPPLE, Circuit Judges, and REYNOLDS, Senior District Judge.*
 RIPPLE, Circuit Judge.
 
 
 1
 This case involves an appeal and a cross-appeal from an order of the district court apportioning the assets of a local union after the local was put under trusteeship by its international. The Tile, Marble, Terrazzo, Finishers, Shopworkers and Granite Cutters International Union, AFL-CIO (the "TMT" or the "International") contends that the court erred in finding that assets placed in a mortuary fund by Ceramic Tile Finishers Union, Local 25 ("Local 25" or "the Local") were not assets within the scope of the trusteeship. The International also contends that the district court erred in upholding a payment by the Local to its attorney. The Local, in its cross-appeal, argues that the district court erred in finding that its one-half interest in its union hall is an asset covered by the trusteeship. For the following reasons, we affirm in part and vacate in part the judgment of the district court.
 
 
 2
 * BACKGROUND
 
 A. Facts
 
 3
 This case was tried to the bench, and the district court entered findings of fact and conclusions of law, as required by Fed.R.Civ.P. 52(a). Because neither party contests the accuracy of the district court's findings of the basic facts, we accept them for the purposes of this appeal. Fed.R.Civ.P. 52(a) ("Findings of fact ... shall not be set aside unless clearly erroneous"); Forum Corp. of N. Am. v. Forum, Ltd., 903 F.2d 434, 438 (7th Cir.1990); Jennings v. Tinley Park Community Consol. Sch. Dist. No. 146, 864 F.2d 1368, 1372-73 (7th Cir.1988). A summary of the facts found by the district court follows.
 
 
 4
 At all times material to this case, Local 25, which is based in Chicago, was affiliated with the International. Until October 1987, defendants Robert Douglas, Joseph Willekens, William Lichtenstein, John McKenna, and Donald Fischer were officers and executive board members of Local 25. Edward Miller, a nonparty to this suit, was the Local's business agent. Since at least 1970, a number of officers and members of Local 25 believed that their interests would be better served by affiliating with another union, the International Union of Bricklayers and Allied Craftsmen ("the BAC"). Apparently, this view was shared by persons in other TMT-affiliated locals. See Tile, Marble, Terrazzo, Finishers v. Tile, Marble, Terrazzo, Helpers and Finishers Local 32, 896 F.2d 1404 (3d Cir.1990) (detailing the defection of the members of the Philadelphia and Harrisburg local from the TMT to the BAC).
 
 
 5
 Around August 1987, representatives of Local 25 and at least four other TMT locals met at Newark Airport with representatives of the BAC. During this meeting the BAC representatives stated that their union would not accept a local that sought as an organization to disaffiliate from the TMT and then to reaffiliate with the BAC. However, if individual members and officers chose to resign from the TMT, they would be accepted for BAC membership. The BAC would charter new locals for the former TMT members, if there were sufficient applications for membership in a particular place. If there were insufficient applications, those members who wished to switch to the BAC would be placed into existing BAC locals. One issue of concern was the disposition of the locals' assets. It was feared that, when the membership left, these assets would become the property of the TMT, or would otherwise remain behind with the locals. Another concern was that the TMT would place the locals (and their assets) under trusteeship. Several possible ways to avoid the loss of these assets were discussed, including placing some or all of the locals' assets in "mortuary funds" which would pay death benefits to the locals' members' survivors.
 
 
 6
 On September 14, 1987, the executive board of Local 25 held a regularly scheduled meeting. The minutes reflect that the board discussed disaffiliating from the International and joining the BAC. The board also voted to present several recommendations to the Local's membership related to disaffiliating, including (1) paying $20,000 to the Local's then attorney, Lawrence J. Weiner and (2) establishing a Mortuary Fund in the amount of $500 per member. The next evening, September 15, Local 25 held a regularly scheduled general membership meeting during which affiliation with the BAC was discussed. In this meeting, the membership unanimously voted to accept the minutes containing these recommendations to pay Weiner and to set up the Mortuary Fund. According to the district court the effect of this vote was to ratify and adopt the actions recommended by the executive board. Just before the membership meeting was to begin, the TMT International president, Gerald Bombassaro, and two International vice-presidents arrived at Local 25's meeting hall. Bombassaro, who had travelled from Virginia, wanted to speak to the meeting about the BAC, and the effect of disaffiliating on existing collective bargaining agreements. The Local's officers did not allow him to talk.
 
 
 7
 On October 3, 1987, Bombassaro filed charges under the International constitution, apparently as a first step towards putting Local 25 under the International's trusteeship. On October 5, 1987, the Local made the $20,000 payment to Weiner that the membership had approved.[1] On or about October 16th, an agreement setting up the Mortuary Fund was executed by its trustees, who were the six officers of Local 25, and some of whom are individual defendants in this suit. This agreement provided for the fund to have $117,500, of which $20,000 would be for legal and administrative fees, and $97,500 would provide a $500 contribution per member. On October 18, the International held a hearing on the International's trusteeship in a Chicago-area hotel; although several of the Local's officers were present in the building, they did not attend. On October 20th in the early afternoon, Bombassaro moved to put Local 25 under trusteeship by appointing a trustee and by removing all of the Local's officers. Shortly after 3 p.m., Eastern time, Bombassaro arranged for mailgrams to be sent to the Local's officers. The parties stipulate that, for the purposes of this litigation, this trusteeship was validly imposed.
 
 
 8
 Throughout this period, the Local officers/Mortuary Fund trustees had been arranging for the Local's assets to be placed in the name of the Mortuary Fund. On October 15th, the day before the trust agreement was signed, defendant Robert Douglas contacted a securities brokerage firm and asked that the name on a certificate of deposit worth approximately $53,000 be changed from Local 25 to the "Local 25 Mortuary Fund." A representative of the firm advised Douglas that additional paperwork would be required to change the name, and Douglas provided this additional documentation by letter of October 27. The name on the account was changed shortly afterwards. Also, on October 20th, the day the International took action to impose the trusteeship, Douglas and Local 25's business agent Edward Miller transferred approximately $72,300 from the Local's money market account to a newly established account entitled "Local 25 Mortuary Fund." The bank's records indicate that it made the transfer sometime after 2 p.m., and that the bank itself closed to the public at 4:30 p.m.
 
 
 9
 These transfers and the $20,000 payment to Weiner left Local 25 with liquid assets of approximately $6300. The Local also held an undivided one-half interest in the building which serves as its union hall. On October 20, Local 25 owed $1300 in federal taxes, $5447.70 in regular per capita taxes due to the International (for the period covering August to October), and a supplemental per capita tax of $4607.50 (covering January through October). However, the International had not sought to collect this supplemental tax pending the outcome of litigation challenging its legality. Beginning on October 20th, and continuing over the next two months, all of the approximately 200 members of Local 25 resigned. A new local, Helpers Local 25, BAC, was formed on October 15, and it appears effectively to have replaced Local 25.
 
 B. District Court Proceedings
 
 10
 The International brought suit to enforce its trusteeship over Local 25 and to gain access to the Local's records and assets. Federal jurisdiction over this claim exists under section 301(a) of the Labor-Management Relations Act, 29 U.S.C. § 185(a). See International Bhd. of Boilermakers v. Local Lodge 714, 845 F.2d 687, 691 (7th Cir.1988); see also Wooddell v. International Bhd. of Elec. Workers, --- U.S. ----, 112 S.Ct. 494, 500-01, 116 L.Ed.2d 419 (1991) ("union constitutions are an important form of contract between labor organizations" and suits to enforce them are cognizable under section 301(a)); United Ass'n of Journeymen and Apprentices of the Plumbing and Pipefitting Indus. v. Local 334, 452 U.S. 615, 626, 101 S.Ct. 2546, 2553, 69 L.Ed.2d 280 (1981) (same). The International also included in its complaint a second count seeking personal damages against members of the Local's leadership for violations of the International's constitution and of their fiduciary obligations.
 
 
 11
 After a bench trial, the district court concluded that the trusteeship that the International imposed was valid and in force. The court also held that, pursuant to the International's constitution, the defendants were required to deliver to the trustee all books, records, and property of Local 25, including all money held in the Local's name. However, the court rejected the International's argument that the money transferred to the Mortuary Fund was an asset of the Local covered by the trusteeship:
 
 
 12
 [u]nder the Constitution and By-Laws of both the International and Local 25 (see Art.XI, § 30 of [the International's Constitution] and Art.XV, §§ 1 and 2 of [Local 25's Constitution], the establishment of a mortuary fund is a valid purpose. The court finds that the mortuary fund was properly proposed by the executive committee of Local 25 at a valid executive committee meeting and was adopted by the membership at a regularly scheduled membership meeting, where a quorum was present, in accord with the Constitution and By-Laws. The Mortuary Trust Fund was established prior to the imposition of the trusteeship. The court further finds that no provision of the International Constitution or the local Constitution was violated in the process.... Accordingly, the court declares the mortuary trust fund to be valid and existing. Since the mortuary fund was properly established it was the duty of the officers to execute the necessary documentation to establish the trust and to fund it in accordance with the action of the membership.
 
 
 13
 R.125, Findings of Fact and Conclusions of Law at 17-18 (citations omitted). Also, although the court did not find the precise time when the trusteeship over Local 25 was imposed, nor when the assets of the Local were moved to the Mortuary Fund, it concluded that a duty to place assets into the fund would have devolved onto either the Local's officers or the union trustee.
 
 
 14
 Since the action establishing the trust was proper, its funding would be ministerial and the obligation to do so would have devolved upon the trustee had the existing officers of the local failed to do so. This follows from the contractual relationships that the Constitution, ByLaws, and actions taken by the membership create to govern the conduct of a local's affairs. Since the action of the membership creating the mortuary trust fund created a binding contract between the members and their local, the officers of the local were contractually obligated to carry out the necessary steps. A trustee, who assumes the duties of the officers and directors, would likewise be obligated to carry out these contractual duties.
 
 
 15
 Id. at 18.
 
 
 16
 The district court rejected the Local's claim that, on equitable grounds, the Local's union hall should not be included within the trusteeship. The court found that, although the individual members of Local 25 were free to disassociate themselves from the International, the loss of the union hall was the price they paid, under the International constitution, for exercising this right. Finally, the court denied the International's claim for personal damages against the individual defendants--the former officers of Local 25--apparently concluding that the officers had done nothing wrong because creating and endowing the Mortuary Fund was proper and there was insufficient evidence to establish that the $20,000 payment to Weiner was excessive.
 
 II
 ANALYSIS
 
 17
 Both the International and Local 25 appeal from the district court's order allocating the assets of the Local. At issue are two assets of the Local, the Mortuary Fund and its building. Also contested is the Local's payment to its attorney. We shall deal with each of these issues in turn.
 
 A. The Assets Within the Trusteeship
 
 18
 Before analyzing the parties' claims regarding the assets in the trusteeship, we pause to sharpen the focus of our inquiry. This is not a case where the existence or the validity of the union trusteeship is challenged. Cf. International Bhd. of Boilermakers v. Local Lodge D129, 910 F.2d 1056, 1062 (2d Cir.1990); Local Lodge 714, 845 F.2d at 691-95. All parties agree that a valid trusteeship was imposed on Local 25. See 29 U.S.C. § 462.[2] They also agree that the International constitution requires that upon imposition of a trusteeship:
 
 
 19
 The trustee shall take possession of all such funds, books, records, papers of the Local Union or subordinate body and tender receipt for same. He shall pay all outstanding claims, properly proved, if funds are sufficient.
 
 
 20
 Ex.1, Constitution and By-Laws of the Tile, Marble, Terrazzo, Finishers, Shopworkers, & Granite Cutters International Union (AFL-CIO) (revised by Las Vegas, Nevada, Convention August 23-26, 1982) ("TMT Constitution"), art. VII, § 3. See International Bhd. of Boilermakers v. Kelly, 815 F.2d 912, 916 (3d Cir.1987). Instead, the parties challenge the district court's decision to assign certain Local 25 assets to the trusteeship and to exclude others. The International contends that the district court erred in deciding that the Local's assets were transferred to the Mortuary Fund, and were therefore not covered by the trusteeship. Local 25 contends that the district court erred when it refused to exercise its equitable powers to give the Local control of the union hall.
 
 1. The International's appeal
 
 21
 In its brief, the International argues that, for several reasons, the assets in the Mortuary Fund were never properly transferred from the Local to the Mortuary Fund. As a result, it contends, the assets never left the Local, and they should be covered by the trusteeship. The International first asserts that the transfer to the Mortuary Fund was a nullity because it was not authorized by either the International's or the Local's constitution. Second, it argues that, under Illinois trust law, the Mortuary Fund was never properly established because the res of the trust was not transferred until after the trusteeship was imposed. We note that, to the extent that these arguments require us to construe the unambiguous language of the union constitutions, we are faced with a question of law. International Bhd. of Boilermakers v. Local Lodge D354, 897 F.2d 1400, 1406 (7th Cir.1990); International Bhd. of Boilermakers v. Local Lodge D504, 866 F.2d 641, 645 (3d Cir.1989), cert. denied, 493 U.S. 812, 110 S.Ct. 59, 107 L.Ed.2d 27 (1989).
 
 
 22
 Article XV, section 2 of Local 25's constitution directs that:
 
 
 23
 The Local Union may establish death benefits or other types of benefits. All such death benefits or other types of benefits shall be submitted to the membership for their approval before same becomes effective.
 
 
 24
 Ex.2, Constitution of Chicago Tile Finishers Local # 25, art. XV, § 2. As the International appears to admit, this provision authorized the Local to establish the Mortuary Fund. The Third Circuit reached the same conclusion in another case where a TMT local deliberately attempted to shield its assets from the International by placing them in a mortuary fund. See Tile, Marble, Terrazzo, Finishers, 896 F.2d at 1414-15 (holding that identical language in the constitution of the Philadelphia Tile, Marble, Terrazzo, Finishers local authorized it to place "an amount not to exceed one hundred percent of the cash assets" into a mortuary fund). This provision of the Local constitution contains no express limit on the amount that a local may put into this fund. See id. ("Therefore, the transfer of the Local's treasury funds to a mortuary fund for the benefit of the members of Local 32 Philadelphia was not an improper disbursement per se.").
 
 
 25
 a.
 
 
 26
 Despite this explicit authorization, the International contends that several implicit limits constrained the Local's ability to endow the Mortuary Fund. First, it suggests that the policies which underlie section 501(a) of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 501(a),[3] act as a limit on the Local's ability to place assets in the Fund. Section 501(a)'s primary goal is to deal with the problem of corrupt management of funds by union officials. See Talbot v. Robert Matthews Distrib. Co., 961 F.2d 654, 666 (7th Cir.1992); Corea v. Welo, 937 F.2d 1132, 1143 (6th Cir.1991); Trustees of Operative Plasterers' and Cement Masons' Local Union Officers and Employees Pension Fund v. Journeymen Plasterers' Protective and Benevolent Soc'y, 794 F.2d 1217, 1221 (7th Cir.1986); Ray v. Young, 753 F.2d 386, 389 (5th Cir.1985). Consistent with this goal, section 501 duties normally are not violated when a union official acts with authorization, without direct personal gain, and in accordance with the union's constitution and bylaws. See Council 49 v. Reach, 843 F.2d 1343, 1347 (11th Cir.1988) ("where decisions regarding the use of the union funds have been authorized in accordance with the union's constitution, by-laws, or other applicable governing provisions, 'a court will typically not have cause to review the reasonableness of the [decision]' ") (quoting Ray, 753 F.2d at 390); McNamara v. Johnston, 522 F.2d 1157, 1163 (7th Cir.1975). As this case is presented to us, these policy concerns are not at stake.[4] The Mortuary Fund was proposed by the Local's officers and validly ratified by the membership at a general membership meeting. R.125, Findings of Fact and Conclusions of Law at 7. In addition, the death benefit that it created was given to all Local members equally.
 
 
 27
 b.
 
 
 28
 The International also claims that moving the assets into the Fund violated two independent provisions of the International constitution: Article I, section 3,[5] which articulates the general goals of the organization, and Article XI, section 10,[6] which requires the Local to pay per capita taxes to the International. With regard to Article I, section 3, we fail to see how endowing a Mortuary Fund that was authorized by the union constitution, and that provided members a useful benefit, was a breach of that section's broad goal of helping union members. Also, with regard to Article XI, section 10, the fact that the Local had tax obligations to the International did not disable the Local from transferring assets into the Fund. First, the district court found that on October 20, 1987, Local 25 owed the International $5,447.70 in regular per capita taxes and $4,607.50 in supplemental per capita tax. However, as the Third Circuit noted in Tile, Marble, Terrazzo, Finishers, 896 F.2d at 1415, the supplemental per capita tax, which was the subject of litigation, was a contingent liability that did not become actual until June 1988. The transfer of assets to the Mortuary Fund left approximately $6,300 in Local 25's treasury, which was enough to cover the $5,447.70 that it then owed in accrued per capita taxes. In addition, as the district court noted, the International points to no provision of the union constitutions that expressly forbids the Local from making a disbursement that would prevent it from meeting its financial obligations to the International. See R.125, Findings of Fact and Conclusions of Law at 18-19. Apparently, locals which adopted a "model local constitution" had such a provision. This local did not.
 
 
 29
 Finally, it appears that, when the Local's federal tax obligation of $1300 is figured into the analysis, the disbursement to the Mortuary Fund may have created a deficit. However, we agree with the district court that the mere existence of this relatively small deficit ($500) does not void the transfer.
 
 
 30
 c.
 
 
 31
 As an alternative argument for the invalidity of the Mortuary Fund, the International contends that the Mortuary Fund was not created until after the imposition of the trusteeship, and that therefore the trustee has the right to retain the assets put into the Mortuary Fund. In support of this argument, the International relies upon cases construing Illinois trust law which, it maintains, hold that a trust is not perfected until legal title to or possession of the res is delivered to the trustee. See In re Glenview Imports, 27 B.R. 496, 500 (Bankr.N.D.Ill.1983). It then asserts that the necessary delivery "did not occur until after the trusteeship was implemented on October 20, when the monies were transferred from the union's treasury to the trust accounts." Appellant's Br. at 7.
 
 
 32
 As a threshold matter, we note that the International is assuming factual conclusions that were not made by the district court. In its Findings of Fact, the district court made no express determination as to when the trusteeship was actually imposed on October 20th, and when the funds were transferred from the Local to the Mortuary Fund. See R.125. Therefore, the record is not as clear as the International paints it. Absent requisite judicial findings, it cannot claim that the trust is invalid because the res was not delivered before the imposition of the International's trusteeship.
 
 
 33
 At best, the International can argue that, if the assets of the Mortuary Fund were transferred after the trusteeship was imposed, the trustee has the right to control the assets and demand their return. However, the district court squarely addressed this issue and ruled that, even if the funds had not been transferred until the trusteeship was imposed, under the governing constitutions, the trustee would have been under a duty to place assets into the Mortuary Fund if the Local's officers had not done so. The district court held:
 
 
 34
 Since the mortuary fund was properly established it was the duty of the officers to execute the necessary documentation to establish the trust and to fund it in accordance with the action of the membership.
 
 
 35
 Since the action establishing the trust was proper, its funding would be ministerial and the obligation to do so would have devolved upon the trustee had the existing officers of the local failed to do so. This follows from the contractual relationships that the Constitution, By-Laws, and actions taken by the membership create to govern the conduct of a local's affairs. Since the action of the membership creating the mortuary trust fund created a binding contract between the members and their local, the officers of the local were contractually obligated to carry out the necessary steps. A trustee, who assumes the duties of the officers and directors, would likewise be obligated to carry out these contractual duties.
 
 
 36
 R.125, Findings of Fact and Conclusions of Law at 18. The International makes no argument that the district court erred in this interpretation of the union constitutions.[7] It does not contend that the trustee could abrogate the resolution of the union members ordering the fund, nor does it argue that it would not have had a duty to endow the Mortuary Fund, if the Local's officers had not done so. Therefore, the International's claim based on Illinois trust law, even if accepted, would have no effect on the district court's holding that, under the terms of the union constitutions, the trustee would have been obligated to endow the Fund. We therefore reject the International's claim based on state trust law.
 
 
 37
 d.
 
 
 38
 As the above discussion indicates, we agree with the district court's basic analysis with respect to the Mortuary Fund. We note, however, an ambiguity with respect to the amount placed in the Fund. The document establishing the Mortuary Fund required that the Fund receive $117,500 as its initial endowment. This amount included $97,500 for benefits and $20,000 for expenses. However, the district court found that approximately $125,300 was eventually transferred into the Mortuary Fund, $7,800 more than the $117,500 mandated by the document creating the Fund. We are given no explanation as to why an amount greater than the funding required by the document was placed in the Fund. We shall therefore remand the case to the district court for the limited purpose of determining whether an amount beyond $117,500 was transferred properly to the Mortuary Fund.
 
 2. The Local's cross-appeal
 
 39
 In its cross-appeal, the Local contends that the district court erred in awarding the trustee control over Local 25's one-half interest in its union hall. It asserts that, while this interest was an asset of the Local when the trusteeship was imposed, the district court should have exercised its equitable powers and exempted it from the trustee's control. As authority for this proposition, the Local principally relies on our statement in Local Lodge 714, 845 F.2d at 695, that, when allocating assets upon a local union's disaffiliation, "equitable factors may come into play, especially in cases where the parent union expelled the local." The Local then notes four factors which it claims required the court to exempt the union hall--(1) that the Local purchased and maintained the building without the assistance of the International; (2) that the International, in general, neglected the Local; (3) that the International allegedly relied on undemocratic voting procedures at conventions to deny the members an opportunity to change the union; and (4) that, after Local 25's members left, the International allegedly threatened and pressured them to return to the union.
 
 
 40
 The district court declined to disregard the International constitution and exempt the union hall. It reasoned that it was not warranted because the members of Local 25 were not pushed out of the union, but instead left voluntarily. We agree. The trustee has a right under the International constitution to take control of the union hall. We believe that the district court did not abuse its discretion in enforcing the International constitution and ordering that the union hall be a part of the trusteeship.[8]
 
 B. Attorney's Fee
 
 41
 The International argues that the district court erred when it failed to find the payment to Weiner excessive, and in violation of the International constitution. However, having reviewed the record, we believe that the district court did not err in this finding. The record supports the conclusion that the payment was to serve as a nonrefundable retainer for services to the Local. Ex. 40. In addition, testimony indicates that Weiner did perform various legal services for the Local, including drafting the Mortuary Fund agreement. The court's finding that there was insufficient evidence on which to conclude that the payment was excessive was not clearly erroneous. See Forum Corp. of N. Am., 903 F.2d at 438 ("We review findings of fact under the clearly erroneous standard...."). Because the payment to Weiner was not unreasonable and was ratified by the membership, we agree with the district court that the payment did not violate the International constitution.
 
 Conclusion
 
 42
 For the foregoing reasons,[9] the judgment of the district court is affirmed in part and vacated in part. The case is remanded for further proceedings consistent with this opinion. Each party shall bear its costs in this court.
 
 
 43
 AFFIRMED IN PART VACATED IN PART AND REMANDED.
 
 
 
 *
 The Hon. John W. Reynolds, Senior District Judge of the United States District Court for the Eastern District of Wisconsin, is sitting by designation
 
 
 [1]
 The district court characterized this payment as intended to compensate Weiner
 for legal services rendered or to be rendered in connection with these events. Prior to that time, Weiner had been receiving $150 per month as a regular retainer for telephonic advice and he billed separately for additional services. Weiner did not submit a bill for the work involved in the $20,000 payment. He received no other compensation for his attendance at the Newark meeting in August, his attendance at the September 14th executive board meeting, his research for and preparation of the mortuary trust fund documents, or other services. Insufficient evidence was introduced to enable the court to find whether the fee was excessive or not.
 R.125, Findings of Fact and Conclusions of Law at 8.
 
 
 [2]
 Section 462 states that:
 Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body and for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization.
 29 U.S.C. § 462.
 
 
 [3]
 Section 501(a) states:
 (a) Duties of officers; exculpatory provisions and resolutions void
 The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy.
 29 U.S.C. § 501(a).
 
 
 [4]
 We find it unnecessary to decide whether a union could sue under section 501 without meeting the procedural prerequisites of the statute. See Guidry v. Sheet Metal Workers Nat'l Pension Fund, 493 U.S. 365, 374 n. 16, 110 S.Ct. 680, 686 n. 16, 107 L.Ed.2d 782 (1990) (noting conflicting holding of lower courts); cf. Operative Plasterers & Cement Masons Int'l Ass'n v. Benjamin, 776 F.Supp. 1360, 1363-66 (N.D.Ind.1991) (discussing authorities)
 
 
 [5]
 Article I, section 3 states:
 The purposes and objects of this organization are to aid our members to become more skillful and efficient workers; to elevate our crafts so that our members may earn a dignified and decent livelihood for themselves and their dependents; to regulate, maintain and sustain the basic purposes of Collective Bargaining with employers as such agreements relate to wages, hours, and conditions of labor; promote the individual rights in the prosecution of their trades; to cultivate friendship among the men of the craft; to assist our members in securing and stabilizing employment; and such other purposes and objects for which working people may be lawfully drawn for their mutual protection and benefit.
 Ex.1, TMT Constitution, art. I, § 3.
 
 
 [6]
 Article XI, section 10 states:
 Each local union or subordinate body shall be responsible to the International Union for its Per Capita Tax payments made for and on behalf of each local member, as well as all information relating to the initiation, readmission, suspension, expulsion, or the demise of any local member. Should any local union fail, refuse or neglect to file all such reports to the International Union, or should such local union falsify such reports, the General Executive Council, after hearing, may suspend the said local union. If as a result of the negligence and/or failure of the Financial Secretary of a local union to report Per Capita Tax payments promptly, or should such officer or officers of the local union fail, refuse or neglect to file all such reports to the International Union as required, then after investigation, proper notification and fair hearing, said officer or officers if found guilty may be suspended or expelled. In such cases the expenses for such investigation shall be charged to and paid for by the local union. And also, in such cases the members of the guilty local will not lose any election rights or privileges outlined in this Constitution. If a local union is found guilty of violation of this section, the General President may then issue a new charter under the same conditions as outlined in Article IX, Section 4.
 Ex.1, TMT Constitution, art. XI, § 10.
 
 
 [7]
 Indeed, the reasonableness of the district court's interpretation is supported by Article VII, section 3, of the International's constitution which states that the trustee is required to pay all outstanding claims against a local put under trusteeship:
 The trustee shall take possession of all such funds, books, records, papers of the Local Union or subordinate body and tender receipt for same. He shall pay all outstanding claims, properly proved, if funds are sufficient.
 Ex.1, TMT Constitution, art. VII, § 3.
 
 
 [8]
 In its reply brief, Local 25 makes the argument that our review of the district court's decision not to award it the union hall should be de novo because the district court believed that it did not have the discretion to make this award. We cannot accept the Local's argument. Having reviewed the district court's Findings of Fact and Conclusions of Law, we believe that the court recognized that it could apply its equitable powers to the question of ownership of the union hall, but simply declined to do so
 
 
 [9]
 Because we have determined that the Local's officers did not expend improperly the Local's funds, we need not address whether it would have been appropriate to impose liability on the individual officers