Maria E. FIELDS, Appellant,

v.

TEAMSTERS LOCAL UNION NO. 988 and Terry Lovan, Appellees.

No. 01–99–00304–CV.

Court of Appeals of Texas, Houston (1st Dist.).

June 8, 2000.

Rehearing Overruled July 20, 2000.

Fritz Barnett, John H. Stevenson, Houston, for appellant.

Jim S. Hart, Richard N. Countiss, Eric H. Nelson, Houston, for appellees.

Panel consists of Justices MIRABAL, TAFT, and PRICE.*

## MAJORITY OPINION

TIM TAFT, Justice.

Appellant, Maria E. Fields, challenges a no-evidence summary judgment rendered in favor of appellees, Teamsters Local Union 988 (the Union) and Terry Lovan, against her claims for gender discrimination, retaliation, and sexual harassment, under the Texas Commission on Human Rights Act (TCHRA), and for intentional infliction of emotional distress. We address whether (1) the Union is a proper defendant under the TCHRA and whether there is any evidence showing (2) a causal connection exists between Fields' complaints and her discharge from employment, (3) the Union's reason for firing Fields was a pretext, (4) Lovan's conduct was extreme and outrageous, and (5) Fields' emotional distress was severe. We affirm in part and reverse in part.

### Facts

The summary judgment evidence submitted by Fields shows that Fields began work for the Union in January, 1996. While the Union was under a trusteeship, Lovan was appointed trustee in January 1997. Fields served as his secretary. Fields claims that Lovan became obsessed with her within weeks of her becoming his secretary.

Fields denies any sexual relationship with Lovan. Fields first felt threatened by Lovan in early February, 1997, when, on introducing him to her sister, he said, "Oh, so now you are dumping me off on

---

* The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

your sister." A week later, Lovan asked Fields out for a drink, saying "You owe me one." Later that evening, Fields met some friends after work at a club where Lovan was also in attendance. While at the club, Lovan repeatedly asked Fields to dance with him and she consistently refused. Later in the evening, Lovan caught Fields returning from the restroom and grabbed her by the arm and said, "Let's go dance." In pulling her toward the dance floor, he pulled her purse off her shoulder. Fields continued to tell Lovan that she did not want to dance as he continued to pull her toward the dance floor. She eventually became embarrassed at the spectacle they were causing and stopped resisting to dance briefly with Lovan. While dancing, Fields reasserted that she did not want to dance and eventually left Lovan to return to her friends. The following day, Lovan left a message on Fields' answering machine asking her to come to his apartment for "pizza, beer, and a hot tub." Fields did not return Lovan's telephone call.

On the following day, which was a Sunday, Fields received a three-way call from Lovan and Gina, a co-worker of Fields. Lovan insisted that they all meet that day to discuss Fields's work performance. When Fields inquired further, Lovan answered that he did not want to discuss it on the phone. Fields asked if the discussion would be good or bad, and Lovan replied that it all depended on her answers. Lovan stated that "all this" came about because he had been thinking about her over the past two days. The past two days encompassed the incidents when Lovan forced Fields to dance with him and asked her over for "pizza, beer, and a hot tub." Fields told Lovan she would have to call him and Gina back because she had to take her daughter out for lunch. Lovan suggested they all get together for lunch. Fields suggested they meet at a restaurant so she could take her daughter, but Lovan refused to allow the daughter to attend. Lovan decided they would meet at the Daiquiri Factory. Fields had to arrange for someone to watch her daughter so she could meet Gina and Lovan. When she arrived at the Daiquiri Factory, Gina and Lovan were not there. She called Gina who said the meeting had been moved to Lovan's apartment. After several attempts to get Lovan to explain what the meeting was about, Fields hung up.

The following workday, Lovan called Fields into his office and started berating her about personal phone calls, doctor visits, and vacation scheduling. Lovan proceeded to tell Fields that her loyalty should be with him because he was the trustee and he would be the one to recommend her and decide whether she would stay or go. At that point, Lovan's speech turned to personal matters as he began to discuss their dancing together. Lovan admitted that he had forced her to dance but claimed that he did not need to force himself on anyone because he has had three or four women. Fields did not know whether to interpret this remark as meaning he had been with three or four women at the same time or had dated three or four women at the same time. Lovan continued to reassert that Fields's insurance and job security depended on his recommending her. Fields told Lovan she was confused what all this meant and thought he was mixing personal matters with work. Lovan did not respond, but kept on reinforcing that he would to decide whether she stayed or not. Fields interpreted the meeting as a threat to coerce her to "go along with his advances."

At some point after this meeting with Lovan, Fields spoke with some co-workers to complain about Lovan's conduct, after which Lovan called Fields into his office for another meeting. Lovan wanted to know why Fields was going over his head. After asking to whom Fields had spoken, Lovan asserted that whatever decision he made, the persons she identified would back him up. Lovan went on to state that his feelings had been hurt because Fields had demonstrated a lack of loyalty when

she refused to meet with him at his apartment over the weekend. At this point, Lovan apologized to Fields for his behavior and stated he hoped they could just be friends. But when Fields responded that she hoped Lovan would not hold the incidents against her, Lovan answered, "The only thing I want to hold against you is me." Fields repeated her request, because she felt Lovan was not getting the message, but Lovan responded with the same comment about wanting to hold himself against her. Then Lovan got up and put his arms around Fields, at which point she disengaged herself and left.

On another occasion, Lovan asked Fields if she had kissed another co-worker. When Fields denied having kissed the co-worker, Lovan asked Fields if she knew what "liplock" was. After Fields answered "no," Lovan responded saying, "Well, why don't you come over here and I'll show you." A co-worker witnessed this exchange between Lovan and Fields.

On another occasion, Lovan told another co-worker, in the presence of Fields, that he needed to get another secretary who would rub his back because "I cannot get nothing out of this one." Lovan followed up this statement by asking Fields if she knew how to massage. Lovan concluded by stating that he might have to change Fields's job description to include giving back rubs. During a separate incident at work, Lovan told Fields she would be a good nurse and asked her to sit down and hold his hand so he would feel better. Lovan also asked Fields out for drinks on two separate occasions. On one of these occasions, Lovan asked if she wanted to go out for some "Jack and Coke." Fields said "no" and repeated her answer as Lovan continued to ask her out. Finally, Lovan asked, "Well, do you want to go somewhere and get drunk, then we can forget about daylight." Again, Fields answered "no." Fields also recalled that Lovan left a gift of perfume on her desk.

Fields finally complained about Lovan's conduct to Robert Alvarez, a union business agent, who suggested she contact Roland Bell. Roland Bell told Fields to contact "Joe," who told her he would talk to someone in the Union legal department. When Fields heard nothing back, she approached the legal department on her own. Fields described how she thought she was being sexually harassed to Mary Connelly and then Bruce Fickman in The Union's legal department. Connelly and Fickman told Fields they would investigate the allegations, but never contacted her again.

After Lovan learned that Fields had complained about his conduct, he embarked on a series of transactions Fields perceived as directly related to her complaint. First, Lovan left a note on her desk stating that she should call and ask him out because he could not call her. Lovan changed the locks in the office but did not give a key to Fields because, he said, she did not need one. Lovan had these locks changed when Fields was out meeting with Fickman about her complaint. Around the same time, Lovan implemented a new time clock requirement. Fields perceived the new procedure as aimed at retaliating against and intimidating her because it happened shortly after she lodged her complaint, and Lovan discussed the change with each member of the staff except Fields in his own office. Lovan stopped giving work to Fields and she was the only office worker who was not told to stay and help count the ballots for the March union presidential election. Finally, Lovan displayed a doll with a see-through dress in his office. He had received the doll on a birthday cake given to him by a female co-worker.

In April 1997, after the union election, Crawley, the new president, fired four persons. Each fired person supported the losing presidential candidate, Nelson. Of the four, Fields was the only office staff person fired.

Fields claims that the harassment she suffered was severe, pervasive, and involved her job. The harassment inter-

fered with her job performance because Fields had to worry about her job and Lovan. Fields felt threatened at the outset by Lovan's harassing conduct. She was embarrassed when Lovan pulled her onto the dance floor, and she was embarrassed when she heard the phone message in front of her daughter and boyfriend that Lovan asked her out for "pizza, beer, and hot tub." Fields felt threatened, intimidated, and humiliated when Lovan implied that her employment was conditioned on acquiescing to his advances. Fields broke down and cried after a meeting in which Lovan implied that she should pursue a personal relationship with him so she could continue to support her children. The "sex doll" Lovan kept in his office humiliated and embarrassed Fields. After she was fired, Fields complained of feeling "very stressed out" and suffering from stomach pains.

## Procedural History

Fields brought suit against the Union and Lovan alleging gender discrimination, retaliation, and sexual harassment in violation of the TCHRA and for intentional infliction of emotional distress. The trial court granted the Union's and Lovan's separate motions for no-evidence summary judgment on Fields's claims of intentional infliction of emotional distress and all TCHRA claims. On appeal, Fields raises two issues: (1) whether the trial court erred in granting summary judgment to the Union on her TCHRA claims,[1] and (2) whether the trial court erred in granting summary judgment to Lovan and the Union on her intentional infliction of emotional distress claim.

## Standard of Review

In a no-evidence summary judgment, the movant must specifically state the elements as to which there is no evidence. TEX.R. CIV. P. 166a(i). The burden then

shifts to the non-movant to produce evidence that raises a fact issue on the challenged elements. *Id.* When reviewing the grant of a no-evidence summary judgment, we assume all evidence favorable to the non-movant is true, and indulge every reasonable inference and resolve all doubts in favor of the non-movant. *Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp.*, 994 S.W.2d 830, 834 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (rule 166a(i) motion). A no-evidence summary judgment is improperly granted if the non-movant brings forth more than a scintilla of evidence to raise a genuine issue of material fact. TEX.R. CIV. P. 166a(i). Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). Conversely, more than a scintilla exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995).

The purpose of the summary judgment rule is not to provide for a trial by deposition or affidavit. *Gaines v. Hamman*, 163 Tex. 618, 358 S.W.2d 557, 563 (1962). Rather, the rule provides a means of efficiently resolving a case that involves only a question of law, with no genuine material fact issues. *Id.* Our duty is to determine if there are any material fact issues to try, not to weigh the evidence or determine its credibility and try this case on the affidavits and depositions presented. *Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929, 931 (1952).

## TCHRA

We note first that Fields challenges only the summary judgment rendered in favor of the Union on her TCHRA claims. As Lovan correctly points out in his brief,

---

1. Fields has not preserved her gender discrimination on appeal. She argues only that the trial court wrongfully granted summary judgment on her TCHRA claims involving sexual harassment and retaliation.

Fields has waived any challenge to the summary judgment rendered in favor of Lovan on her TCHRA claims by not addressing this issue in her brief. *See Greathouse v. McConnell*, 982 S.W.2d 165, 175 (Tex.App.—Houston [1st Dist.] 1998, pet. denied).

Fields brought her claim of discrimination under the TCHRA. TEX. LAB.CODE ANN. § 21.001— § 21.306 (Vernon 1996 & Supp.2000). The purpose of the TCHRA is to provide for the execution of the policies embodied in Title VII,[2] the "correlation of state law with federal law in the area of discrimination in employment." TEX. LAB.CODE ANN. § 21.001(3) (Vernon 1996); *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 485 (Tex.1991). Because the TCHRA seeks to promote federal civil rights policy and because Texas has little case law interpreting the TCHRA, it is proper to look to analogous federal precedent. *Farrington v. Sysco Food Servs., Inc.*, 865 S.W.2d 247, 251 (Tex.App.—Houston [1st Dist.] 1993, writ denied).

## A. "Employer" Standing

To address the first issue Fields raises, we must decide whether the Union is a proper defendant under the TCHRA. The Union argues it is not a proper defendant because it has less than 15 employees and because Fields is not a member of the local union.

Fields asserted two discrimination claims in her petition: sexual harassment and gender discrimination. *See* TEX. LAB. CODE ANN. § 21.051 (Vernon 1996) (prohibiting discrimination based on sex); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66–67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (holding that sexual harassment is a form of employment discrimination). To sue for sexual harassment or gender discrimination under Labor Code section 21.051, Fields must show

that the Union is an "employer" under the TCHRA.

An "employer" under the TCHRA must have at least 15 employees. TEX. LAB.CODE ANN. § 21.002(8)(A) (Vernon Supp.2000). Fields does not allege that the Union has 15 or more employees, but brings two separate arguments to demonstrate that the Union otherwise falls under the TCHRA. Fields claims her sexual harassment and gender discrimination causes of action arise under Labor Code section 21.051 because the Union and the International Union are a single employer and collectively have more than the minimum requirement of 15 employees. Fields alternatively contends she can bring her retaliation cause of action under Labor Code section 21.055 because the Union is a "labor union" and Fields is a "person."

### 1. Single employer theory

■■■ Under the single employer theory, two entities are viewed as a single employer for liability and jurisdictional purposes. *See Childs v. Local 18, Int'l Bhd. of Elec. Workers*, 719 F.2d 1379, 1382 (9th Cir.1983); *Campbell v. Int'l Brotherhood of Teamsters*, 69 F.Supp.2d 380, 385 (E.D.N.Y.1999). To determine whether two entities should be treated as a single employer, we consider whether they have: (1) interrelated operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. *Childs*, 719 F.2d at 1382. The second element, which is the most important, asks "What entity made the final decisions regarding employment matters related to the person claiming discrimination?" *Campbell*, 69 F.Supp.2d at 385.

Fields points to the following statements from Lovan's deposition to show that the Union and the International Union were a single employer. Ron Carey, the General President of the International Union, or-

2. Civil Rights Act of 1964, §§ 101–1106, 42 U.S.C. §§ 1981–2000h–6 (1994 & Supp. III 1994).

dered Terry Lovan to Houston as a trustee for the Union. A trustee's duties or responsibilities are to run the local union, and see that it services its members and functions correctly and properly. During this period of trusteeship, the local union was "under the direction of the international [union]." Local unions lose their autonomy when a trusteeship is imposed. Lovan was solely responsible for staffing, hiring, and firing. The president of the International Union had the authority to involve himself in the staffing decisions of the local union during trusteeship. The trustee was in full charge of the affairs of the local union under the direction of the General President. When Lovan had legal questions, he called the International Union's lawyers. When Fields complained about Lovan, the International Union investigated the allegations. Finally, the trustee appointed by the International Union supervised the financial expenditures of the local union.

■ These facts alone are insufficient to establish single employer status between the Union and the International Union. Most of Fields's allegations fall short because a trustee assumes the duties of the local union officer he replaces and is obligated to carry out the interests of the local union and not the appointing entity. *Tile, Marble, Terrazzo, Finishers, Shopworkers and Granite Cutters Int'l Union v. Ceramic Tile Finishers Union, Local 25,* 972 F.2d 738, 746 (7th Cir.1992).

Other federal cases have found similar circumstances insufficient to demonstrate a single employer. It is insufficient to assert that an international union had control when the trustee made employment decisions and was appointed by the international union. *Campbell,* 69 F.Supp.2d at 385. It is insufficient to show that the local union is chartered by the international union. *Childs,* 719 F.2d at 1382. Moreover, it is insufficient to allege that the international union charters the local union, receives dues from the local, and has the power to dissolve the local, to receive the local's assets, to impose a trusteeship over the local, and to control its affairs. *Herman v. United Bhd. of Carpenters and Joiners of America, Local Union No. 971,* 60 F.3d 1375, 1383–84 (9th Cir.1995).

The summary judgment evidence does not give rise to a fact issue about whether the Union and the International Union are a single employer for purposes of the TCHRA. Lovan assumed the duties of the local union officer he replaced and was obligated to carry out the interests of the Union and not the International Union. *Ceramic Tile Finishers Union, Local 25,* 972 F.2d at 746. As Fields conceded in her own testimony, Lovan made the final decisions regarding employment matters relating to her. *Campbell,* 69 F.Supp.2d at 385. Because Lovan's conduct and the relationship between the Union and the International Union do not show a single employer, the Union is not an "employer" under the TCHRA. Accordingly, we affirm the summary judgment rendered in favor of the Union on Fields's sexual harassment and gender discrimination claims.

## 2. Labor Union

■ In regard to her retaliation claim, Fields argues that the Union is a proper defendant under section 21.055 of the Texas Labor Code. This section states:

An employer, labor union, or employment agency commits an unlawful employment practice if the employer, labor union, or employment agency retaliates or discriminates against a person who, under this chapter:

(1) opposes a discriminatory practice;

(2) makes or files a charge;

(3) files a complaint; or,

(4) testifies, assists or participates in any manner in an investigation, proceeding or hearing.

TEX. LAB.CODE ANN. § 21.055 (Vernon

1996).[3]

The Union counters that this statute is inapplicable because Fields was not a union member and because her complaint against the Union was in its capacity as an employer and not as a union. Because Fields's retaliation cause of action against the Union arose out of an employer/employee relationship, the Union contends Fields must show that the Union meets the definition of an "employer" under the TCHRA. *See* Tex. Lab.Code Ann. § 21.002(8) (Vernon Supp.2000).

While no Texas case directly addresses how section 21.055 applies to an employer/employee context when a labor union is involved, the Union relies on numerous federal cases that interpret section 2000e–2[4] as requiring that a labor union sued in its capacity as an employer must meet the statutory definition of an employer. *See Herman,* 60 F.3d at 1384–85; *Greenlees v. Eidenmuller Enterprises, Inc.,* 32 F.3d 197, 198 (5th Cir.1994); *Chavero v. Local 241, Division of Amalgamated Transit Union,* 787 F.2d 1154, 1155 (7th Cir.1986); *Phelps v. Int'l Molders & Allied Workers Union Local 63,* 25 Fair Empl. Prac. Cas. (BNA) 1164, 1166, 1981 WL 192 (D.Minn. 1981) (holding that when plaintiff attempts to hold an employment agency or union liable as an employer under 42 U.S.C. section 2000e–2, the employment agency or union must meet the "employer" definition). We note that these cases do not interpret the federal statute analogous to Labor Code section 21.055. These cases interpret section 2000e–2, which makes it an unlawful employment practice for an employer, employment agency, or labor union to discriminate against any person because of her race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2 (a-c).

3. The analagous federal provision states:

> *It shall be an unlawful employment practice* for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or *for a labor organization to discriminate against any member thereof or applicant for membership,* because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. 42 U.S.C.A. § 2000e–3(a) (1994) (emphasis added).

4. (a) Employer practices

> It shall be an unlawful employment practice for an employer-
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
> (b) Employment agency practices
> It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin.
> (c) Labor organization practices
> It shall be an unlawful employment practice for a labor organization-
> (1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;
> (2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or
> (3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.
> 42 U.S.C.A. § 2000e–2 (1994).

None of these cases interprets section 2000e–3, the analogous federal counterpart to Labor Code section 21.055, which is applicable to retaliation claims.

Moreover, Texas Labor Code section 21.055 is broader than 42 U.S.C. section 2000e–3, and does not require that the labor union be sued in its capacity as a labor union. Section 2000e–3 makes it an unlawful employment practice for a labor union to retaliate against "any *member* thereof or *applicant* for membership, because he has opposed any practice made an unlawful employment practice by this subchapter ..." 42 U.S.C. § 2000e–3(a) (emphasis added). The Labor Code removes any restrictive language, and makes it an unlawful employment practice for a labor union to retaliate or discriminate "against any person." TEX. LAB.CODE § 21.055. Fields argues that, because she is "a person" and the Union is a "labor union," she may sue the Union in its capacity as a labor union under section 21.055, even though she is not a union member. The Union maintains that, because Fields is suing the Union in its capacity as an employer, Fields must show that the Union meets the definition of an employer.

 Our goal in interpreting a statute is to give effect to legislative intent. *Monsanto Co. v. Cornerstones Mun. Util. Dist.*, 865 S.W.2d 937, 939 (Tex.1993). "Legislative intent remains the polestar of statutory construction." *City of LaPorte v. Barfield*, 898 S.W.2d 288, 292 (Tex.1995). However, the cardinal rule in Texas is that a court construes a statute, "first, by looking to the plain and common meaning of the statute's words." *Liberty Mut. Ins. Co. v. Garrison Contractors*, 966 S.W.2d 482, 484 (Tex.1998). "If the meaning of the statutory language is unambiguous, we adopt, with few exceptions, the interpretation supported by the plain meaning of the provision's words and terms." *Fitzgerald*

*v. Advanced Spine Fixation Systems, Inc.*, 996 S.W.2d 864, 865 (Tex.1999). Moreover, if a statute is unambiguous on its face, rules of construction or other extrinsic aids cannot be used to create ambiguity. *See id.* at 865–66.[5]

When the purpose of a legislative enactment is obvious from the language of the law itself, there is nothing left to construction. In such case it is vain to ask the courts to attempt to liberate an invisible spirit, supposed to live concealed within the body of the law.

*Dodson v. Bunton*, 81 Tex. 655, 17 S.W. 507, 508 (1891).

There are sound reasons why we begin with the plain language of a statute before resorting to rules of construction. For one, we may fairly assume that the legislature means what it says, and therefore "the words it chooses should be the surest guide to legislative intent." *Fitzgerald*, 996 S.W.2d at 866. On a practical level, ordinary citizens should be able to rely on the plain language of a statute to mean what it says. *Addison v. Holly Hill Fruit Prods., Inc.*, 322 U.S. 607, 618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944). "Moreover, when we stray from the plain language of a statute, we risk encroaching on the legislature's function to decide what the law should be." *Fitzgerald*, 996 S.W.2d at 866.

When we look at the plain language of section 21.055, it is clear that the legislature intended that this statute apply to a "labor union" when it "retaliates or discriminates" against "a person" because that person opposes, in some manner, the unlawful employment practices of the "labor union." *See* TEX. LAB.CODE ANN. § 21.055. It is also clear that the legislature implemented very different language from the analogous federal provision. Section 2000e–3 limits its reach to labor unions who retaliate or discriminate against

---

5. This approach seems to conflict with the legislature's intent that: (1) the Code Construction Act apply to construction of each provision of the Texas Labor Code, TEX. LAB.

CODE ANN. § 1.002 (Vernon 1996); and (2) rules of construction may be used whether or not a statement is ambiguous on its face, TEX. GOV'T CODE ANN. § 311.023 (Vernon 1998).

members or applicants, while Labor Code section 21.055 adopts more liberal language that subjects the labor union to liability when it retaliates or discriminates against "a person." *Compare* TEX. LAB. CODE ANN. § 21.055 *with* 42 U.S.C. § 2000e–3(a).

■■■ We reach the same conclusion, that section 21.055 applies to labor unions when sued in their capacity as an employer, even when we apply rules of construction. The Union's interpretation of section 21.055 would require us to insert language into the text of the statute by making section 21.055 read "... when a labor union retaliates or discriminates against a person [who is a union member or applicant] ..." A court "will not insert additional words into a statute unless it is necessary to give effect to clear legislative intent." *Hunter v. Fort Worth Capital Corp.*, 620 S.W.2d 547, 552 (Tex.1981); *Neurobehavorial Assoc., P.A. v. Cypress Creek Hosp., Inc.*, 995 S.W.2d 326, 334 (Tex.App.—Houston [1st Dist.] 1999, no pet.). Moreover, "[w]e presume that every word excluded from a statute must [be] excluded for a purpose." *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex.1981); *Neurobehavorial Assoc.*, 995 S.W.2d at 334. There is no clear legislative intent that section 21.055 be limited to union members and applicants. To the contrary, the plain language and the absence of the restrictive language of section 2000e–3 indicates the purpose of expanding section 21.055 to labor unions in their capacity as employers when they retaliate or discriminate against an employee who has opposed a discriminatory practice of that labor union. This interpretation of section 21.055 is also consistent with the rule that any interpretation of "Title VII, a remedial statute, should be construed in favor of those whom the legislation was designed to protect." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 101, 111 S.Ct. 453, 460, 112 L.Ed.2d 435 (1990).

The Union relies on *Yerdon v. Henry*, 91 F.3d 370 (2d Cir.1996), to claim that Fields's complaint fails under section 21.055 because she is not a union member and her complaint is employment-related in nature. *Yerdon* involved a union secretary who sued her union for sexual harassment under 42 U.S.C. section 2000e–2 and retaliation under 42 U.S.C. section 2000e–3(a). *Id.* at 373–74. The Second Circuit agreed with other courts holding that a labor union sued under section 2000e–2 in its capacity as an employer is not a proper defendant unless the labor union meets the definition of "employer" under section 2000e(b). *Id.* at 376–77. Because Yerdon was suing a labor union with less than 15 employees as an employer, and not in its capacity as a labor union, she had no cause of action under section 2000e–2. The Second Circuit did not hesitate to address the merits of Yerdon's retaliation claim under section 2000e–3, however. *Id.* at 377. Even though Yerdon sued a labor union in its capacity as an employer, she was not denied her retaliation claim.

■■■ Accordingly, Fields does not forfeit her retaliation claim by suing the Union in its capacity as an employer. Section 21.055 of the Labor Code goes even further than section 2000e–3, by eliminating any language that could be construed as limiting the class of defendants to entities sued in their respective capacities. *See* TEX. LAB.CODE ANN. § 21.055. A retaliation cause of action under Texas Labor Code section 21.055 or 42 U.S.C. section 2000e–3 does not require that a labor union sued in its capacity as an employer meet the statutory definition of an employer. *See Yerdon*, 91 F.3d at 376–77.

We conclude Fields can bring her retaliation claim against the Union in its capacity as an employer under Labor Code section 21.055.

**B. Causal Connection**

■■■ The Union argues that Fields cannot maintain a retaliation claim because she has not shown a causal connection

between her reporting Lovan for sexual harassment and being fired. Fields contends she raised sufficient summary judgment evidence of a causal connection between the complaint of harassment and her termination. Fields notes that her termination came within weeks of her complaint. She relies on *Swanson v. General Services Admin.*, 110 F.3d 1180, 1188 (5th Cir.1997), for the proposition that temporal proximity may provide an inference of a causal connection.

The Union disputes this rule as "no rule at all because it has no boundaries." The Union demonstrates its point by alluding to cases in which courts did not find a causal connection based on temporal proximity when the complaint and adverse employment action were separated by two and a half years, 10 months, and six months. *See e.g., Azubuike v. Fiesta Mart, Inc.*, 970 S.W.2d 60, 65 (Tex.App.—Houston [14th Dist.] 1998, no pet.) (holding lapse of two and one-half years between plaintiff's discrimination complaint and termination did not support inference of retaliation). These cases do not undermine Fields's argument that proximity may establish a causal connection between her complaint and the adverse employment action when, as here, they are separated by weeks, as opposed to months and years.

The Union further contends it conclusively established that Crawley, who fired Fields, was unaware of any complaint filed by Fields. Crawley testified that he was unaware of any complaint filed by Fields against Lovan and that Lovan played no role in the decision to discharge Fields. But Fields testified that Crawley indicated to her that he was aware of the dispute between Lovan and Fields before discharging Fields. Fields also testified that Lovan was still in charge of the Union when she was discharged. Moreover, Lovan told Fields during more than one of their meetings that he would decide whether she would go or stay and that others in the office would support his decision to fire her. Fields raised sufficient

evidence of causation to defeat the Union's motion for summary judgment on Fields's TCHRA retaliation claim.

## C. Neutral/Pretextual Reason

The Union argues that it produced a neutral reason for discharging Fields: the newly elected president, Crawley, wanted a new secretary, was not comfortable with Fields's work performance, and did not trust her because she supported his opponent during the election. We note, yet again, the controverting evidence: Crawley was aware of the dispute, though he denies it; Lovan stated he would decide whether Fields would stay or go and had the support of others at the office; and Lovan's continuing authority at the Union when Fields was discharged. There is some evidence that raises a genuine issue of material fact whether Fields was discharged pretextually.

Fields has produced some evidence on her retaliation claim under the TCHRA. She has met the standard required under rule 166a(i) for a no-evidence summary judgment by bringing forward some evidence on the issues challenged. *See* Tex.R. Civ. P. 166a(i).

We conclude there are material fact issues as to whether a causal connection exists between Lovan's conduct and Fields's discharge, and whether the Union's reasons for firing Fields were pretextual. Moreover, Fields has shown that the Union is a proper defendant under section 21.055 of the Labor Code. Therefore, the trial court erred in rendering summary judgment in favor of the Union on Fields's retaliation claim under the TCHRA.

We overrule Fields's first issue as it relates to her sexual harassment claim and sustain the first issue as it relates to her retaliation claim under the TCHRA.

### Intentional Infliction of Emotional Distress

In her second issue, Fields argues that the trial court erred in granting summary

judgment to the Union and Lovan on her claim of intentional infliction of emotional distress. Because the Union may be liable for Lovan's conduct as his employer, our analysis of this issue will refer only to Lovan but will also apply to the Union. *See GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 617–18 (Tex.1999).

▮ To maintain a claim for intentional infliction of emotional distress, Fields must show that (1) Lovan acted intentionally or recklessly; (2) his conduct was extreme and outrageous; (3) Lovan's actions caused Fields emotional distress, and (4) the emotional distress suffered by Fields was severe. *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993); *Farrington v. Sysco Food Services, Inc.,* 865 S.W.2d 247, 254 (Tex.App.—Houston [1st Dist.] 1993, writ denied).

Lovan and the Union moved for no-evidence summary judgment by asserting that Fields had brought forward no evidence showing that she suffered from severe emotional distress or that Lovan's conduct was sufficiently outrageous. Fields claims she introduced ample evidence demonstrating that she suffered from severe emotional distress and that Lovan's conduct was sufficiently outrageous.

In addressing claims of intentional infliction of emotional distress, the Supreme Court of Texas and this Court have deferred to section 46 of the Restatement Second of Torts and its comments. *See Twyman,* 855 S.W.2d at 621–22; *Neuro–Developmental Assoc. v. Corporate Pines Realty Corp.,* 908 S.W.2d 26, 28 (Tex. App.—Houston [1st Dist.] 1995, writ denied). Comment h to the Restatement sets out the roles of jurors and judges:

> It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

RESTATEMENT (SECOND) OF TORTS § 46 cmt. h (1965). The same standard is applied to a determination of severe emotional distress in comment j. RESTATEMENT (SECOND) OF TORTS § 46 cmt. j (1965). Therefore, we must determine whether Fields has raised any evidence showing Lovan's conduct was sufficiently outrageous, and her emotional distress sufficiently severe, that reasonable minds could differ as to whether it was outrageous and severe. *See* TEX.R. CIV. P. 166a(i); RESTATEMENT (SECOND) OF TORTS § 46 cmt. h, j.

### A. Extreme and Outrageous Conduct

▮ The context and the relationship between the parties must be considered when determining whether certain conduct is extreme and outrageous. *GTE Southwest, Inc.,* 998 S.W.2d at 612, 614. "[W]hen repeated or ongoing severe harassment is shown, the conduct should be evaluated as a whole in determining whether it is extreme and outrageous." *Id.* at 616.

▮ Conduct that is extreme and outrageous is conduct that goes "beyond all possible bounds of decency, and [is] to be regarded as atrocious, and utterly intolerable in a civilized community." *Wornick Co. v. Casas,* 856 S.W.2d 732, 735 (Tex. 1993) (citing RESTATEMENT (SECOND) OF TORTS § 46 cmt. d); *Neuro–Developmental,* 908 S.W.2d at 28. Rude behavior does not equate to outrageousness, and behavior is not outrageous simply because it is tortious. *Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 699 (Tex.1994). "[P]laintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." RESTATEMENT (SECOND) OF TORTS § 46 cmt. d. In the work context, employers are afforded latitude in exercising their right to fire employees, though emotional distress

results. *GTE,* 998 S.W.2d at 612. Consequently, extreme and outrageous behavior in the workplace must fall "outside the scope of an ordinary employment dispute and into the realm of extreme and outrageous conduct." *Id.* at 613.

In determining whether Fields's description of Lovan's conduct directed to her was some evidence of extreme and outrageous conduct, we must address whether this conduct rises to the level that reasonable minds could disagree whether it was extreme and outrageous. *See* TEX.R. CIV. P. 166a(i); RESTATEMENT (SECOND) OF TORTS § 46 cmt. h. Fields described harassment that took place over a three-month period. Because the harassment she described was severe and continual, Lovan's conduct should be evaluated as a whole in determining whether it is extreme and outrageous. *GTE,* 998 S.W.2d at 616.

As stated earlier in more detail, although Fields rebuffed every advance, Lovan persisted in pursuing an intimate relationship with Fields, over a three month period. Lovan used, to his advantage, his position of authority over her and his knowledge of her need to support herself and her child while pressuring her to acquiesce to his advances.

Lovan and the Union cite a plethora of cases holding that certain conduct was not extreme and outrageous, and attempt to analogize them to the facts of this case. *See e.g., Horton v. Montgomery Ward & Co.,* 827 S.W.2d 361 (Tex.App.—San Antonio 1992, writ denied) (conduct of co-worker who cursed at plaintiff, committed assault and battery, hit her with a wad of paper, placed rattlesnake rattlers in her desk, and defaced her pictures was not extreme and outrageous); *Garcia v. Andrews,* 867 S.W.2d 409 (Tex.App.—Corpus Christi 1993, no writ) (conduct of manager who made sexually suggestive and embarrassing remarks to plaintiff and mentally undressed her, was not extreme and outrageous); *Diamond Shamrock Ref. and Mktg. Co. v. Mendez,* 844 S.W.2d 198 (Tex. 1992) (conduct of employer who wrongfully accused plaintiff of thievery and fired him was not extreme and outrageous conduct); *Beiser v. Tomball Hosp. Auth.,* 902 S.W.2d 721 (Tex.App.—Houston [1st Dist.] 1995, writ denied) (termination in violation of a whistleblower statute was not in itself extreme and outrageous conduct); *Porterfield v. Galen Hosp. Corp., Inc.,* 948 S.W.2d 916 (Tex.App.—San Antonio 1997, writ denied) (verbal abuse, refusal to allow plaintiff lunch breaks, and hostile demonstrations when plaintiff left work sick was not extreme and outrageous conduct); *Gearhart v. Eye Centers of America, Inc.,* 888 F.Supp. 814 (S.D.Tex.1995) (supervisor's comment about plaintiff sleeping with him, comments about plaintiff's breasts, comments about other women, and touching plaintiff's breasts and buttocks was not extreme and outrageous conduct).

We need not distinguish these cases, as each case stands or falls on its own merits and its individual facts, except as to one critical point. No case Lovan and the Union cite involves allegations that an employer threatened to fire an employee if she did not succumb to sexual advances. While some of these cases involved sexual harassment in an employment context, none involved an employer's holding job security over the head of an employee in exchange for sexual favors. This factor clearly removes Fields's description of Lovan's behavior from the realm of employment disputes and boorish behavior and nearer the realm of extreme and outrageous conduct.

We recognize that the facts of this case fall midway among the cases dealing with intentional infliction of emotional distress. This is not a case of an employer with a gun in hand who threatens an employee. Nor is it a case of an employer who simply uses foul language around the water cooler. When the facts fall somewhere between two clearly recognized extremes of what is and is not extreme and outrageous conduct, our task becomes significantly more difficult. Cases that involve claims of sexual harassment and intentional inflic-

tion of emotional distress do not establish a bright line distinction. While clear acts of sexual harassment may be found to rise to the level of extreme and outrageous conduct in one case, in another case seemingly similar facts may fall short of the same standard. Frequently and unfortunately, the cases do not distinguish themselves factually, but simply conclude that particular behavior should or should not be tolerated in a civilized community. *Compare Garcia*, 867 S.W.2d at 412 (conduct of employer who mentally undressed plaintiff with his eyes, asked her if she did her best work in the dark, and talked about the size of men's genitalia was not extreme and outrageous) *with Stokes v. Puckett*, 972 S.W.2d 921, 925 (Tex.App.—Beaumont 1998) (conduct of employer who touched breasts or buttocks of three female employees, made statements involving sexual innuendo, used foul language, and asked one employee to have a relationship with him was extreme and outrageous conduct). Factual distinctions in the case law and the Restatement Second of Torts are helpful, however, in determining what is extreme and outrageous conduct.

We begin with a factually similar case, *Bushell v. Dean*, 781 S.W.2d 652 (Tex. App.—Austin 1989), *rev'd on other grounds*, 803 S.W.2d 711 (Tex.1991). In *Bushell*, the employer rubbed the neck of his female employee, poked her in the ribs, talked to her about his marital and sexual problems, asked her on one occasion to have a sexual liaison with him, and brought the subject up again on other occasions, argued in front of other employees about his request for sexual favors, and shouted at her in front of other employees. *Id.* at 654, 658. The *Bushell* court found these facts legally and factually sufficient to support a claim for intentional infliction of emotional distress. *Id.* at 658.

"The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a retaliation with the other, which gives him actual or appar-

ent authority over the other, or power to affect his interests." RESTATEMENT (SECOND) OF TORTS § 46 cmt. e. The abuse Fields described in this case arises out of the relationship Lovan and Fields shared as employer and employee. *See GTE*, 998 S.W.2d at 612, 614. Lovan abused this position of authority over Fields by repeatedly making it clear that he wanted sexual favors from Fields, and that he would decide whether she would go or stay, based on whether she complied. The Restatement illustrates this point with similar facts in the context of a creditor.

> A, a creditor, seeking to collect a debt from B, sends B a series of letters in lurid envelopes bearing a picture of lightning about to strike, in which A repeatedly threatens suit without bringing it, reviles B as a deadbeat, a dishonest man, and a criminal, and threatens to garnish his wages, to bother his employer so much that B will be discharged, and to "tie B up tight as a drum" if he does not pay. P suffers severe emotional distress. A is subject to liability to B.

RESTATEMENT (SECOND) OF TORTS § 46 illus. 7. Likewise, Lovan's abuse of his position of authority, by repeatedly threatening to fire Fields, while coercing her to give in to his sexual advancements, brings this action within the realm of conduct contemplated under comment e.

"The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." *Id.* at cmt. f. Fields claimed that when Lovan was pressuring her into a physical relationship and threatening to have her fired, he interjected the amount of her income and her insurance benefits. Fields believed this was an attempt by Lovan to further coerce her to yield to his sexual advances because he was aware that Fields was a single mother with two children, and thus critically dependent on her job income and insurance benefits.

Comment f uses two contrasting illustrations. In one, a man shoots a dog before the eyes of a woman who is greatly attached to the dog. The commentators indicate that this is sufficient to rise to the level of extreme and outrageous conduct because of the individual's knowledge of the victim's sensitivities. *Id.* at illus. 11. In the second illustration, a man calls a woman who is sensitive about her weight a "hippopotamus." The behavior is not extreme and outrageous. *Id.* at illus. 13. The facts Fields alleged here are more similar to illustration 11. Lovan threatened to fire Fields if she did not acquiesce to his sexual advances, while reminding her that she had children at home who relied on her to stay employed and retain her level of salary and insurance benefits.

Case law illustrates the crucial distinction that arises when an employer manipulates the employee's peculiar susceptibilities. The conduct of an employer who stared at his female employee, commented on her breasts, touched his own genitals in front of her, made repeated sexual references, and insulted and yelled at her, was not extreme and outrageous. *Garcia v. Schwab,* 967 S.W.2d 883, 885, 887 (Tex. App.—Corpus Christi 1998, no pet.). In contrast, the conduct of an employer who ridiculed a female employee's cancer surgery, joked about her breasts, and touched her breast at the site of her surgery was extreme and outrageous. *Soto v. El Paso Natural Gas Co.,* 942 S.W.2d 671 (Tex. App.—El Paso 1997, writ denied). A major distinction in these cases is the employer's knowledge of the employee's increased susceptibility or vulnerability to the employer's atrocious conduct. Lovan's knowledge of Fields's familial status, coupled with the coercive tactics she described, is more similar to the *Soto* case, and brings this action within the realm of conduct contemplated under comment f of the Restatement Second of Torts section 46.

Lovan's conduct, viewed in light of all of Lovan's harassment directed toward Fields, his position of authority over her, and his manipulation of Fields's peculiar susceptibilities to emotional distress, could be regarded by reasonable minds as beyond the scope of an ordinary employment dispute, and thus within the realm of extreme and outrageous conduct. *See GTE,* 998 S.W.2d at 613.

## B. Severe Emotional Distress.

Severe emotional distress is "distress that is so severe that no reasonable person could be expected to endure it." *GTE,* 998 S.W.2d at 618. "It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." RESTATEMENT (SECOND) OF TORTS § 46 cmt. j; *see GTE,* 998 S.W.2d at 618. In determining whether Fields presented sufficient evidence to defeat Lovan's motion for summary judgment, we inquire whether the distress rises to the level that reasonable minds could disagree whether it was extreme and outrageous. *See* TEX.R. CIV. P. 166a(i); RESTATEMENT (SECOND) OF TORTS § 46 cmt. j.

Fields presented summary judgment evidence that her distress was severe. She claimed her suffering was severe, pervasive, and involved her job. Her suffering interfered with her job performance because Fields had to worry about her job and Lovan. Fields felt threatened at the outset by Lovan's harassing conduct. She was embarrassed when Lovan pulled her onto the dance floor and when Lovan asked her out for "pizza, beer, and hot tub." Fields felt threatened, intimidated, and humiliated when Lovan implied that her employment was conditioned on acquiescing to his advances. Fields broke down and cried after a meeting in which Lovan implied that she should pursue a personal relationship with him so she could continue to support her children. The "sex doll" Lovan kept in his office humiliated and embarrassed Fields. After she was fired, Fields complained of feeling

"very stressed out" and suffering from stomach pains.

Lovan cites two cases to show that Fields's distress does not rise to the level of severe emotional distress. *McKethan v. Texas Farm Bureau,* 996 F.2d 734 (5th Cir.1993) (stomach problems and self-diagnosed depression did not meet the severity requirement); *Badgett v. Northwestern Resources Co.,* 818 F.Supp. 998, 1004 (S.D.Tex.1993) (worry over paying bills, headaches, a negative attitude, and alleged depression did not meet the severity requirement). These cases fall short of the range of suffering Fields claimed. She claimed to have been systematically harassed over a three-month period, with resulting severe emotional distress. While her claims of emotional distress, taken individually, may not rise individually to an extreme level, taken together, reasonable minds might or might not find her distress so severe that no reasonable person could be expected to endure it.

We recognize that determinating whether reasonable minds could differ as to the requisite level of severity is a difficult threshold issue. What is unquestionably reasonable to one person may be clearly unreasonable to another. Case law again draws no clear line. Emotional distress was severe when the plaintiff feared for his life, slept with a pistol, cried in public, and lost his appetite. *Behringer v. Behringer,* 884 S.W.2d 839, 841 (Tex.App.—Fort Worth 1994, writ denied). Similarly, the emotional distress was severe when the plaintiff refused to speak or see anyone, became ill and disoriented, and experienced extreme anger. *Tidelands Auto. Club v. Walters,* 699 S.W.2d 939, 942 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.) In contrast, feelings of anger, depression, and humiliation (even when embarrassed in front of children), are insufficient evidence of severe distress. *Regan v. Lee,* 879 S.W.2d 133, 136–37 (Tex.App.—Houston [14th Dist.] 1994, no writ). We take note of the comments offered by Justice Hecht concerning the subjective standard involved in a claim for intentional infliction of emotional distress in *Twyman:*

> What is outrageous unavoidably depends upon the sensitivities of the person asked to decide and to some extent the community in which the conduct occurs. "The term 'outrageous' is neither value-free nor exacting." [citation omitted] Because outrageousness is a subjective, almost personal, notion, its application is as much a matter of who decides as of what happened.
>
> . . . .
>
> ... The only issue for appeal is whether another set of judges has a different view of outrageousness.

*Twyman,* 855 S.W.2d at 631 (Hecht J., concurring and dissenting). While Justice Hecht was addressing the outrageousness element, his remarks apply equally to severe distress.

We hold that Fields has produced sufficient evidence to meet the standard established for no-evidence summary judgment. *See* TEX.R. CIV. P. 166a(i). She has brought forward some evidence regarding which reasonable minds could differ that she suffered severe emotional distress and that Lovan's conduct was extreme and outrageous. Therefore, the trial court erred in granting summary judgment to Lovan and the Union on Fields's claim of intentional infliction of emotional distress.

We sustain Fields's second issue.

### Conclusion

We affirm the judgment of the trial court as to the summary judgment rendered for the Union on the TCHRA sexual harassment claim. We reverse the judgment and remand to the trial court as to the summary judgment rendered for the Union on the TCHRA retaliation claim and for the Union and Lovan on the intentional infliction of emotional distress claim. The

remainder of the judgment is not challenged on appeal, and thus remains intact.

Justice MIRABAL concurring and dissenting.

MARGARET GARNER MIRABAL, Justice, concurring and dissenting.

Appellant Maria Fields brought suit under two sections of the Texas Labor Code: section 21.051 prohibits sexual harassment and gender discrimination by an "employer," and section 21.055 prohibits retaliation by an "employer" or a labor union against a person who files a complaint under chapter 21. Appellant also sued for intentional infliction of emotional distress.

The majority opinion affirms summary judgment for the labor union as to the cause of action under section 21.051 of the Texas Labor Code. I dissent from this holding because the summary judgment evidence raises a fact issue about whether the labor union is an "employer" under the statute. As to the remainder of the opinion, I concur in the result.

### Section 21.051

The majority opinion holds that the labor union established as a matter of law that it was not an "employer" because it did not employ at least 15 employees, and therefore it was not liable under Tex. Lab. Code Ann. § 21.051 (Vernon 1996). Appellant argues that, viewing the local union and the international union as an "integrated enterprise," they employ over 1000 employees, and therefore section 21.051 clearly applies.

An international and local union's *actual relationship* may render the two a single entity, or render the local an agent of the international, for jurisdictional purposes. *Maxwell v. Kight*, 974 F.Supp. 899, 903 n. 3 (E.D.Tex.1996). To determine whether two entities should be treated as a single employer, four factors are to be considered: (1) the interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common

ownership of financial control. *Garcia v. Elf Atochem North America*, 28 F.3d 446, 450 (5th Cir.1994); *Herman v. United Bhd. Of Carpenters & Joiners of America, Local Union No. 971*, 60 F.3d 1375, 1383 (9th Cir.1995).

The summary judgment evidence shows the following. Teamsters Local Union No. 988, was placed under a trusteeship for racketeering activities. Ron Carey, the General President of the International Union, sent Terry Lovan to Houston to take over as trustee of Local Union No. 988. When local unions are not under a trusteeship, they have the autonomy to operate and run themselves. However, during the period of trusteeship, a local union is under the direction of the international union and loses its autonomy. The president of the International Union had the authority to involve himself in the staffing decisions of Local Union No. 988 during the trusteeship. Terry Lovan, as trustee, was in full charge of the affairs of the local union, under the direction of Ron Carey, the General President. When Lovan had legal questions, he called the International Union's lawyers. When appellant Fields made complaints about Lovan, the International Union investigated the allegations. A local union does not operate as a "local" until an election occurs for a new president and executive board. Fields alleged she was sexually harassed, she complained about the harassment, and the retaliatory decision was made to fire her, all before the election of the new president occurred.

The summary judgment evidence also shows that, in addition to Lovan, there were at least three other International Union employees working at Local 988. Doug Collier was an "IBT representative" who answered to the General President's office. Sergio Ponce and Dan Basham were also International Union employees working with the local union.

In my opinion, the summary judgment evidence raises a fact issue about whether the *actual relationship* between Local Union No. 988 and the International Union

rendered the two a single entity or "integrated enterprise" for jurisdictional purposes. *See Trevino v. Celanese Corp.,* 701 F.2d 397, 404 (5th Cir.1983). Accordingly, summary judgment on this ground was improperly granted.

I would reverse the summary judgment *in toto* and remand the whole case to the trial court for further proceedings.