Affirmed and Memorandum Opinion filed March 17, 2009








Affirmed and Memorandum Opinion filed March 17, 2009.

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00699-CV

____________

 

YIQING FENG, Appellant

 

V.

 

SABIC AMERICAS, INC., Appellee

 



 

On Appeal from the 61st
District Court

Harris County, Texas

Trial Court Cause No. 2006-38653

 



 

M E M O R A N D U M   O P I N I O N

In this case, a discharged employee appeals the trial court=s summary judgment
in favor of his former employer as to his claim for retaliation under section
21.055 of the Texas Labor Code.  The summary-judgment evidence does not raise a
fact issue as to whether the employer=s proffered reason
for termination is a pretext or whether engaging in the protected activity was
the but-for cause of the employee=s termination or
any other adverse employment action.  Therefore, we affirm the trial court=s judgment.








                        I.  Factual and Procedural Background

In May 2001, appellant Yiqing Feng started working as a
research associate at the analytical lab of appellee Sabic Americas, Inc.
(hereinafter ASabic@) in Sugarland, Texas.  On December 9,
2005, Sabic terminated Feng=s employment. Feng filed suit against
Sabic alleging that Sabic unlawfully discriminated against him because he is a
Christian, of the Asian race, from China, and suffered from a disability based
on an eye condition.  Feng also asserted a claim for intentional infliction of
emotional distress and for retaliation under section 21.055 of the Texas Labor
Code.  Sabic filed a motion for summary judgment attacking all of Feng=s claims; however,
in his response and on appeal Feng has argued only that summary judgment is
inappropriate as to his retaliation claim.  Therefore, the other, unchallenged
claims are not at issue in this appeal.

As to the retaliation claim, Sabic moved for summary
judgment on the following stated grounds:

(1)     There is no evidence of a causal connection
between Feng=s alleged protected activity and
the adverse employment actions.

(2)     Sabic terminated Feng for  legitimate,
non-discriminatory reasons C insubordination and failure to complete work assignments.

(3)     There is no evidence that Sabic=s proffered reasons were a pretext
for unlawful discrimination.

The
trial court granted summary judgment without specifying the grounds. 

                                         II. Standards of Review








In a traditional motion for summary judgment, if the movant=s motion and summary-judgment
evidence facially establish its right to judgment as a matter of law, the
burden shifts to the nonmovant to raise a genuine, material fact issue
sufficient to defeat summary judgment.  M.D. Anderson Hosp. & Tumor
Inst. v. Willrich, 28 S.W.3d 22, 23 (Tex. 2000) (per curiam).  In our de novo
review of a trial court=s summary judgment, we consider all the
evidence in the light most favorable to the nonmovant, crediting evidence
favorable to the nonmovant if reasonable jurors could, and disregarding
contrary evidence unless reasonable jurors could not.  Mack Trucks, Inc. v.
Tamez, 206 S.W.3d 572, 582 (Tex. 2006).  The evidence raises a genuine
issue of fact if reasonable and fair-minded jurors could differ in their
conclusions in light of all of the summary-judgment evidence.  Goodyear Tire
& Rubber Co. v. Mayes, 236 S.W.3d 754, 755 (Tex. 2007) (per curiam). 

In reviewing a no‑evidence summary judgment, we
ascertain whether the nonmovant pointed out summary‑judgment evidence of
probative force to raise a genuine issue of fact as to the essential elements
attacked in the no‑evidence motion.  Johnson v. Brewer &
Pritchard, P.C., 73 S.W.3d 193, 206B08 (Tex. 2002).  A
no‑evidence summary judgment must be granted if the party opposing the
motion does not respond with summary‑judgment evidence that raises a
genuine issue of material fact. See Arguelles v. Kellogg Brown & Root,
Inc., 222 S.W.3d 714, 723 (Tex. App.CHouston [14th
Dist.] 2007, no pet.).  In our de novo review of a trial court=s summary
judgment, we consider all the evidence in the light most favorable to the
nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors
could and disregarding contrary evidence unless reasonable jurors could not.  Mack
Trucks, Inc., 206 S.W.3d at 582. The evidence raises a genuine issue of
fact if reasonable and fair-minded jurors could differ in their conclusions in
light of all of the summary-judgment evidence.  Goodyear Tire & Rubber
Co., 236 S.W.3d at 755B56.  When, as in this case, the trial
court does not specify in the order granting summary judgment the grounds upon
which the trial court relied, we must affirm summary judgment if any one of the
independent summary-judgment grounds is meritorious.  See Ramco Oil &
Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C., 207 S.W.3d 801, 826 (Tex.
App.CHouston [14th
Dist.] 2006, pet. denied).

 

 








                                 III. Issue and Analysis

On appeal, Feng asserts in one issue that the trial court
erred in granting summary judgment as to his retaliation claim because genuine
issues of material fact preclude summary judgment.   Under section 21.055 of
the Texas Labor Code:

An employer . . . commits an unlawful employment practice if the
employer . . . retaliates or discriminates against a person who, under this
chapter:

(1) opposes a discriminatory practice;

(2) makes or files a charge;

(3) files a complaint; or 

(4) testifies, assists, or participates in any manner in an
investigation, proceeding, or hearing.[1]

Tex. Lab. Code Ann. ' 21.055 (Vernon
2006).  The purpose of the Texas Commission
on Human Rights Act is to provide for the execution of the policies of Title
VII of the Civil Rights Act of 1964.  See Tex. Lab. Code ' 21.001(1) (Vernon
1996); Quantum Chem. Corp. v. Toennies, 47 S.W.3d 473, 476 (Tex. 2001). 
Thus, Aanalogous federal
statutes and the cases interpreting them guide@ the reading of
the statute.  Quantum, 47 S.W.3d at 476.








To establish a prima facie case of retaliation, a claimant
must show that (1) he engaged in a protected activity, (2) an adverse
employment action occurred, and (3) there was a causal connection between
participation in the protected activity and the adverse employment decision.  See
Thomas v. Clayton Williams Energy, Inc., 2 S.W.3d 734, 739 (Tex. App.CHouston [14th
Dist. 1999, no pet.).  The burden then shifts to the employer to rebut this
presumption by articulating a legitimate, nondiscriminatory reason for the
adverse employment action. See id.  Upon the employer=s articulation of
a legitimate, nondiscriminatory reason, the presumption raised by the prima
facie case is rebutted.  See id.  At this point the claimant
carries the burden of proving that the employer=s proffered reason
is a pretext and that engaging in the protected activity was the but-for cause
of the adverse employment action.  See Pineda v. United Parcel Serv.,
360 F.3d 483, 485 (5th Cir. 2004); Chaney v. New Orleans Pub. Facility Mgm=t, 179 F.3d 164,
167 (5th Cir. 1999); Quantum, 47 S.W.3d at 479.  

Feng alleges that he was terminated in retaliation for
opposing a discriminatory practice through numerous complaints Feng made
between August 24, 2005, and December 2, 2005, including the filing of a charge
with the Equal Employment Opportunity Commission (hereinafter AEEOC@) on October 22,
2005.  In its motion, Sabic presumed for the sake of argument that Feng was
engaging in a protected activity.  On appeal, we make the same presumption.  It
is undisputed that Sabic terminated Feng on December 9, 2005, which is an
adverse employment action.  For the purposes of our analysis, we also presume
that the evidence raises a fact issue as to whether there was a causal
connection between participation in the alleged protected activity and the
adverse employment decision.[2]
Therefore, based on these presumptions, Feng established a prima facie case of
retaliation, and we must determine whether Sabic articulated a legitimate,
nondiscriminatory reason for terminating Feng=s employment. 








Sabic did articulate a legitimate, nondiscriminatory reason
for terminating Feng=s employment, namely, his insubordinate
behavior.[3] 
See Aldrup v. Caldera, 274 F.3d 282, 286 (5th Cir. 2001); Chaney,
179 F.3d at 167B68.  Therefore, we examine the evidence to
see if there is a fact issue as to whether Sabic=s proffered reason
was a pretext or whether Feng=s engaging in the protected activity was
the but-for cause of adverse employment action.  See Pineda, 360 F.3d at
485; Chaney, 179 F.3d at 167; Quantum, 47 S.W.3d at 479.  

Summary-Judgment
Evidence

In his affidavit, Paul Ellis of Sabic testified as follows:

!       During the time period relevant to Feng=s claims, Ellis was the Manager of
Research at Sabic, and he was responsible for the execution of project plans
and responsible for the people working on all projects.

!       Sabic hired Feng, who is Chinese-American, as
a research associate in May 2001.  Research associates work in the Sabic
Technology Center, a research facility in Sugarland, Texas, and they are
responsible for assisting scientists in the discovery and analysis of new
chemical technology.  Feng=s immediate supervisor was Dr. Xiankuan Zhang, a Chinese-American. 
Zhang reported to Ellis and Syed Bughdadi, the former Center Director. 

!       The other associate in the analytical
laboratory was Qui Nguyen,[4]
who has been employed by Sabic since July 1998. Over time, Feng and Qui
developed interpersonal problems.  These employees worked in close proximity in
the analytical laboratory.  In 2005, after several quarrels and mutual
bickering between them, Bughdadi and Ellis placed these two employees into
separate offices.  However, Feng and Qui continued to share the laboratory
space which contained their respective analytical instruments.








!       Beginning in 2003, Feng was directed to
cross-train on Qui=s equipment and to train Qui on
Feng=s equipment.  The cross-training
was implemented to insure that each of their respective instruments could be
operated by the other in the event of a need arising while one of them was
absent from work.  This direction continued to be reiterated into 2005.  Feng
never completed this task. 

!       In August 2005, a meeting was held with
Zhang, Qui, Feng, and Ellis.  The purpose of this meeting was to direct Qui and
Feng to cease and desist their continuous bickering, to treat each other
professionally, to complete the requested cross-training, and to create drafts
outlining the steps needed for calibration of their instruments as they had
been directed to do, in March 2005.  During this meeting Feng became disruptive
and accused Qui of harassing him.  Feng then made a formal written complaint
which was submitted to Russ Pemberton, the Manager of Human Resources, who
promptly investigated the complaint.  

!       Pemberton met with the involved employees and
their supervisors, Zhang, Ellis, and Bughdadi. He also reviewed various
emails.  Ultimately, Pemberton concluded that no unlawful harassment was
occurring, and he so informed Feng. 

!       Upon the conclusion of this investigation,
Pemberton directed Feng and Qui to behave professionally.  This request was not
honored.  The very next day Feng sent an email to his supervisors and
co-workers accusing Qui of improper research techniques.  In response, on
October 6, 2005, Zhang sent Feng a letter urging him to focus on his own
responsibilities, complete his job duties, and eliminate negative feelings
towards co-workers.  In response to this letter, Feng sent an email stating
that he could not complete his drafting assignment because of an eye
condition.  Throughout October and November 2005, Sabic requested that Feng
provide information from his doctor about this condition.  Sabic requested this
information to learn the nature of the condition so that an appropriate
accommodation could be made.  Feng never provided this information; rather, he
insubordinately challenged his supervisor=s authority to make such a request.  On  October 27, 2005,
Ellis sent a written warning to Feng urging him to stop his insubordinate
behavior.  Emails from Feng to his supervisor continued to be disrespectful,
and Feng was counseled accordingly.








!       On November 18, 2005, Ellis placed Feng on
probation for: (1) his failure to substantiate his claim that a medical
condition precluded him from completing his assignments and (2) his refusal to
comply with his  manager=s direct order to cross train.  In
the letter placing him on probation, Sabic explained that if Feng continued to
not comply with Sabic=s employment standards, his
employment would be terminated.

!       In early December 2005, another meeting to
address cross-training requirements was held with Zhang, Qui, Feng, and Ellis. 
During this meeting Feng was disruptive, disrespectful, and insubordinate. 
Based on Feng=s insubordinate refusal to complete
his drafting assignments and cross-training duties and based upon his
insubordinate refusal to substantiate his medical condition, Pemberton and
Ellis terminated Feng=s employment on December 9, 2005,
after reviewing the matter with Bughdadi and Sabic=s General Manager and securing
their concurrence.  

Feng did not submit a summary-judgment affidavit, but the
facts set forth below are established by Feng=s deposition
testimony and the exhibits thereto, which are part of the summary-judgment
evidence.

Feng started having problems with Qui after November 2001,
when Feng started to Afeel very strange@ because Qui did
not say anything to Feng, making Feng believe Qui was Amad with [Feng].@ In addition, Qui
put up a picture of his spiritual leader, whom Qui said Ahas great power,@ Acan treat a
disease with medicine easily,@ and Acan cause wind.@  Feng complained
to Zhang about this, but Zhang got mad and told Feng that Qui could put a
picture of his religious leader on Qui=s desk.








In the workplace, Feng had a bad relationship with Qui.  On
September 12, 2003, Feng emailed Zhang asking him to tell Andy Nuyen[5],
a Vietnamese-American employee of Sabic, not to stand near Feng=s desk and talk
with Qui because Feng did not Alike it.@  Feng sent
another email the same day saying that he did not mind if anyone else other
than Andy came near his desk to talk.  At his deposition, Feng said he did not
like Andy and Qui talking in the lab because, when they talked, they watched
Feng, and they had angry looks on their faces.  Feng does not know what they
were saying because they spoke in Vietnamese, and Feng does not understand
Vietnamese.  According to Feng, the hostility on their faces made him
depressed, and he did not know how to handle the  situation.  Feng does not
remember what Zhang did in response to his complaints in 2003 regarding Andy
and Qui.

Feng remembers a meeting he had with Qui, Zhang, and
Ellis.  Ellis asked questions about his relationship with Qui.  Ellis talked
about one of them leaving the lab and going to another team.  Feng told Ellis
that he needed a peaceful work environment but that Andy was saying many bad
things about Feng to others and that this is harassment that Ellis should stop.
 Ellis told Feng and Qui that they needed to act professionally and get along
and stop all this bickering between them.  Feng told Ellis that he did nothing
wrong and that he is very professional.  Feng does not remember what Qui said
at this meeting.

Andy did not work in the lab.  The only times Feng would
see Andy was in the lunch room, while passing him in the hallway, or when Andy
came to visit Qui.  Feng first mentioned harassment to Ellis early in 2005, and
Ellis said he would make Andy stop his harassment.  According to Feng, Sabic
did not care about this problem, and Sabic treated Feng badly because he is
Chinese.

In March 2005, Feng had a meeting with Zhang and Qui. 
Zhang told Feng and Qui that, because of an audit by Sabic=s parent company
they had to write operating procedures for all of their equipment.  Feng never
did what Zhang instructed him to do.  Feng did not have the time. He could not
write the procedures without working overtime.  Accordingly to Feng, Qui did
not write the procedures for his equipment either.  








On May 3, 2005, Zhang sent an email to Qui and Feng telling
them that, as discussed in their March meeting, they needed to write procedures
for each analytical instrument that they use.  Zhang stated that he expected to
receive a draft of procedures for one instrument from Feng and Qui soon and
that their target was to complete procedures for two instruments each by the
end of the second quarter.  Feng did not write procedures for any instruments
by the end of the second quarter because he did not have time, and he
communicated this to Zhang.

On July 15, 2005, Zhang sent Feng an email stating that
Feng was required to give Zhang a draft of procedures for one instrument by
July 19, and that Zhang could not delay the matter any further.  Feng responded
by saying he would try to write one if he had time the next week but that if he
did not see Qui=s draft, he would not believe it
reasonable to give Zhang any drafts of procedures.  Zhang responded that he was
not negotiating with Feng and that this task is Aa must@and should be Feng=s Ahighest priority
till [sic] next Tuesday [July 19].@   

In July 2005, Sabic also moved the offices of Qui and Feng
out of the lab so that their respective offices were separated.  Feng stated he
never did anything to Qui, but Qui was always hostile to him, so Feng was happy
when their offices were separated. After the office move, in August 2005, Qui
no longer had the picture of his spiritual leader at Qui=s desk.

Feng started a draft of the procedures but he never
finished it.  On July 25, 2005, Zhang sent Feng and Qui a format for them to
use in drafting the procedures for their instruments and asked them for any
suggestions or comments that they might have.  On August 1, 2005, Zhang emailed
Feng and Qui that he expected to receive a completed document containing the
procedures for one instrument from each of them by the end of the third
quarter.  On August 10, 2005, having not heard back from Feng or Qui, Zhang
sent an email to them stating that the format that Zhang had provided should be
considered the final format for use in creating the document containing the
procedures.[6]









On the morning of August 24, 2005, Ellis met with Qui,
Feng, and Zhang.  During this meeting, Ellis asked why Zhang was doing a safety
inspection job that had been assigned to Feng.  In response, Feng asked Ellis
why he did not answer any questions.  Ellis warned Feng by mentioning Paul
Mark, a Sabic employee who had been fired.  Feng felt that he was eventually
going to be fired based on  discrimination against Chinese people.  

After the meeting, Feng emailed Ellis=s superior, Syed
Bughdadi, saying he was confused by Ellis=s statement that
he was supposed to handle the safety inspection job.  Feng asked Bughdadi if
Feng had done anything wrong and asked whether he would be Athe next Mark,@ referring to the
Sabic employee who had been fired.  Bughdadi responded by asking what Feng was
talking about and whether he was taking Ellis=s words out of
context.  Bughdadi said that Feng and Qui were constantly involved in petty
quarrels, and therefore, Feng=s office had been moved out of the lab. 
Bughdadi stated that Feng should not get Bughdadi involved unless Feng had a
serious complaint because if Feng got Bughdadi involved then Bughdadi would
have the Human Resources Department get involved in the matter.  Feng responded
by saying that he was not involved in petty quarrels with Qui.  Feng stated
that he had not emailed Bughdadi before regarding this issue and that it was
not necessary to involve Bughdadi at that time, although Feng would contact 
Bughdadi if Feng felt that he was not being treated appropriately by Zhang or
Ellis. 

During the August 24, 2005, meeting, Ellis warned Feng and
Qui that their Apoor behavior directed at each other must
stop immediately.@  Later that day, Ellis followed this oral
admonition with a written warning to the same effect.  In the written warning,
Ellis stated that Feng brought up the issue of harassment at the meeting and
that if Feng or any other employee felt they are being harassed they should
bring this issue up with management in an official way.  Management would then
investigate to see if harassment had occurred and to take steps to deal with
it. Ellis stated that harassment and the charge of harassment are serious
matters that will not be ignored.








After the August 24 meeting, Feng sent Ellis an email
stating that Andy had Atalked bad@ about Feng in
front of many people for a long time.  However, Feng stated that he would not
present evidence to Ellis at that time and that Feng thought that the company
had the responsibility to investigate the matter.  Feng said that, even though
Ellis had said at the meeting that Ellis had never heard Andy speak badly about
Feng, this does not mean that Andy had not done so with other people.  At his
deposition, Feng stated that Andy Atalked bad@ about him to
almost everybody at Sabic.  

On August 27, 2005, in response to Sabic=s request, Feng
submitted an official letter complaining about alleged workplace harassment by
Qui and Andy.  In this letter, Feng said that Qui had engaged in religious
harassment because, for three and a half years, he had displayed a picture of
his religious leader on his desk and Feng could see the picture everyday when
he was in the lab.  At his deposition, Feng admitted that Qui had removed the
picture from his desk before August 27, 2005, but he said that hostility still
existed.  Feng also stated that for three and a half years, while Feng had no
personal or professional relationship with Andy, Andy had said bad things about
Feng to many people at Sabic. As a result, some employees did not like to talk
to Feng even though he tried to Asay hello@ to them.  Feng
stated that as a result of these problems, he has been seriously hurt
psychologically, and he has panic disorder, depression, and insomnia.  He said
that he was going to the bathroom at work frequently because of panic and
stress, and he had the idea that some day he would be fired.  

Feng spoke with Sabic=s Human Resource
Manager, Pemberton, on August 26.  Pemberton asked Feng for a list of people
who had witnessed the alleged harassment.  Feng refused to give him any names,
saying he should first ask Zhang and Ellis for names.  








On August 31, 2005, Pemberton issued a confidential
memorandum describing his investigation and concluding that no unlawful
harassment had occurred.  Pemberton stated that he had urged Andy and Qui to be
sensitive to Feng=s perceptions and feelings and that he
asked Feng to be sensitive that other people are not harassing him if they
criticize his work or fail to speak to him on a particular occasion.  Pemberton
asked Feng to inform the Human Resources Department or his supervisor
immediately if Feng had any further problems or complaints.  Feng refused to
sign the memorandum, but he received a copy of the memorandum on September 1,
2005.  That same day, Feng sent an email to Pemberton stating that Pemberton
should have talked to all the employees at Sabic and that Pemberton was taking
Andy=s and Qui=s side.  Feng said
that he had Ato move on@ and that he would
be consulting with attorneys in the future to seek justice in the legal system.

On September 2, 2005, Feng sent an email to various
employees and supervisors, including Qui, Ellis and Zhang.  In the email, Feng
criticized as wrong a testing method used by Qui=s team.  After
Zhang responded, Feng sent another email challenging the quality of Qui=s work.  Zhang
responded by telling Feng to focus on his own work, that Zhang was Qui=s supervisor, that
he was satisfied with the procedure in question, and the Feng should not spend
any more time on it.

On September 8, 2005. Zhang emailed Feng and Qui a reminder
that Zhang expected to receive a completed document containing the procedures
for one instrument from each of them by the end of the third quarter.  The next
day, Feng responded by email that he probably could not complete the document
on time because (1) he felt depressed regarding Qui and Andy=s harassment and
therefore could not focus on the document, (2) he felt pressed to write the
document when he had a lot of lab work, and (3) he had a Acomputer related
illness@ and Acan not stay
longer [sic] in front of a computer monitor.@  Feng stated that
he would continue to work hard and expected that he would not be treated
harshly while seeking justice against the harassment by Qui and Andy and other
issues.  








According to Feng, his computer-related eye problem is
that, when he is in front of a computer monitor, he feels Adry. . . [n]ot
comfortable . . . [h]eadache and frantic.@  Feng claims that
this problem started in July 2005.  Feng stated that he saw a medical doctor
about his problem in November 2005, though the summary-judgment evidence
contains no documents relating to this visit or any evidence that Feng gave
Sabic any such documents before his employment was terminated.  Sabic
instructed Feng to see an eye doctor after Feng said he could not do his job
because of his eye problem.  After Sabic told him this, Feng felt nervous.  He
felt he was not being treated appropriately because he was engaging in
protected activity.  

In cross-training, Qui would train Feng how to use Qui=s instruments and
Feng would train Qui how to use Feng=s instruments. 
Zhang had been telling Feng to cross-train with Qui since around 2002. 
Cross-training was a job requirement.  Feng stated that he never refused to
cross-train and that he performed Aexcellent
cross-training@ with Qui.

On October 6, 2005, Feng had a conference with Zhang, who
gave Feng a letter stating that Feng needed to become better focused on his
responsibilities and to eliminate his negative feelings towards his
colleagues.  The letter outlined Feng=s job duties and
stated that Zhang expected Feng to treat his colleagues with the same respect
that he desires.  Zhang said that he wanted Feng to become more cooperative and
work toward resolving his feelings in a more positive manner.  Zhang also cautioned
Feng against making allegations against colleagues that are unsubstantiated or
without merit.  Zhang stated that if Feng had a concern or complaint in the
future, he should raise it first with Zhang, and if Zhang did not resolve it,
then Feng could pursue the issue with the next level of management.  Zhang
stated that he would closely track Feng=s performance and
that it was up to Feng to bring his performance up to an acceptable level. 
Feng stated that the October 6, 2005 warning letter made him panic and was Arace retaliation@ and Arace
discrimination.@








On the same day, Feng received the warning letter, he
violated one of its provisions by raising a concern in an email sent to higher
levels of management as well as Zhang.  In his email, Feng stated that he would
work hard but that, regarding the requirement that he write procedures for the
instruments, he could not work on that task until his medical condition with
his eye allowed him to work.  Feng stated that he received the letter during Athe period of my
seeking justice on [Qui]  and [Andy]=s working [sic]
place harassment as well as salary discrimination issue on me.@

On October 20, 2005, Zhang sent Feng an email stating that
he needed to provide evidence from his doctor concerning his eye problem and
alleged inability to spend time in front of a computer monitor.  Zhang said
that the human resources department needed the doctor to tell them what medical
condition Feng had and the maximum number of hours he could work on a computer
each day.  

Feng responded the same day saying that he had not seen a
doctor about his eye condition, so he could not provide a doctor=s letter, and he
had no medical records to provide.  Feng stated that for about six months, his
eye had not felt comfortable and he had headaches Aif [he] stay[s]
longer in front of a computer screen.@  Feng stated that
he did not know the maximum hours he could work in front of a computer
monitor.  Feng said that he could work a lot in front of a monitor but that if
the company insisted on this work, then it would be responsible for any damage
to his eye.  Feng stated that during working hours he knows how to handle his
time in front of the computer monitor.

On October 27, 2005, Feng received a written warning letter
from Ellis in which Ellis stated that Feng needed to have a doctor provide
written confirmation of Feng=s eye condition.  Ellis noted that Feng
had been asked to provide this information but had not done so.  Ellis defined
insubordination and noted that, in his October 20, 2005 email, Feng had once
again demonstrated an insubordinate attitude and attempted to tell Zhang how to
manage his work group.  Ellis warned Feng that if he continued to violate the
conditions of his employment he would be subject to further discipline,
including termination of employment.








Feng responded with an email on October 28, 2005, in which
Feng  stated (1) he did not tell Zhang how to manage his work group; (2) he did
suggest to Zhang that Zhang schedule a team meeting to have better work done;
(3) Feng feels he has a right Ato report my peer=s fault completely
for the benefit of Sabic@; (4) by his own definition, Feng has Acomputer-related
illness@; (5) Feng=s wife, who is an
intern medical doctor, advised Feng to spend less time in front of the computer
screen and she also gave him a medicine from China; (6) after taking the
Chinese medicine Feng Areally feel [his] eye relaxed@; (7) if Sabic
still insists on having a medical doctor confirm his illness, then Sabic and
the doctor will be responsible if Feng=s eye is injured
in the future due to working hard in front of the computer monitor; (8) Feng
expects Sabic to stop the racial and religious discrimination that he charged
and stop the long term harassment by Andy and Qui; and (9) Sabic would be
receiving a letter soon from the EEOC.[7]

On November 9, 2005, Ellis emailed Feng asking if he had
made an appointment with an eye doctor yet.  Ellis stated that he wanted Feng
to provide documentation from an eye doctor by November 17, 2005.  Feng
responded the same day saying that (1) he had not yet made an appointment with
an eye doctor; (2) after using Chinese medicine, his eye condition was better
than before; (3) he would make an appointment for his own health purposes; (4)
when he could present a document from the doctor would depend on the doctor=s schedule; and
(5) he still was unsure whether Sabic could require him to present a document
from an eye doctor.








On November 14, 2005, Zhang emailed Qui and Feng saying he
wanted to have a meeting about cross-training.  Feng responded that, based on
his past four years of interaction with Qui, Feng felt Ascared to have a
cross training with [Qui].@  Feng said that he could not cross-train
until the company made corrective action regarding his claims of workplace
harassment and made the analytical environment peaceful.  Zhang said that he
still needed to have the meeting to discuss cross-training.  Feng then
responded by criticizing Qui=s knowledge of his machines and by
indicating that Qui could learn how to operate Feng=s equipment by
means other than cross-training with Feng.

On November 15, 2005, Feng sent an email to Hank Grotewold,
another Sabic employee, saying that earlier in the day when Feng walked back to
the lab, Athrough the door mirror, [Feng] saw that [Andy] [sic]
turning around his head and hostilely looking at [Feng].@  Feng said that
he did not hear what Andy said to Grotewold but that if it was something
hostile, Grotewold should try to stop it. According to an email that is an
exhibit to Feng=s deposition, Grotewold spoke to Feng and
told him that Andy and Grotewold were only talking about the weather and how it
was raining heavily.

On November 18, 2005, Sabic suspended Feng for one day
without pay and placed him on probation.  In Sabic=s suspension
letter, Ellis mentioned Feng=s continued failure to have a medical
doctor evaluate his eye problem and Feng=s refusal to
cross-train with Qui just a few days before.  Ellis stated that Sabic had fully
evaluated Feng=s harassment claims and that Feng could not use them
as an excuse for failing to perform his work duties.  Ellis warned Feng that if
he continued to violate the conditions of his employment he would be
terminated.

After receiving written notice of his suspension, on
November 18, 2005, Feng emailed Pemberton, Ellis, and Bughdadi stating that
after reviewing his suspension letter, Feng decided that on his suspension day
he would file two more charges with the EEOCCone for disability
discrimination and one for retaliation.  He said he was giving notice of these
claims. As to retaliation, Feng stated that after he claimed workplace
harassment, Sabic engaged in steps geared toward terminating his employment and
pushed him to work with a hostile person by requiring him to cross-train with
Qui.  








On December 6, 2005, Feng sent an email (1) stating that he
believed that a third person should observe any cross-training although Zhang
previously had said it was unnecessary, (2) again suggesting means other than
cross-training by which Qui could learn how to operate Feng=s equipment, (3)
responding that he could not finish his draft of procedures for his equipment
because of his medical condition, (4) asking to review Qui=s drafts of
procedures for his equipment, and (5) stating that he wanted all recipients of
the email to know that Athere could be any type of unexpected
events generated from the hostile environment.@  On December 7,
2005, Ellis, Zhang, Qui, and Feng had a meeting to discuss the cross-training
issue following Feng=s December 6 email.  Feng admitted at his
deposition that he called Qui a liar at this meeting.

On December 9, 2005, Sabic terminated Feng=s employment.  At
his deposition, Feng testified that Pemberton and Ellis came into his lab and
Ellis announced Feng was terminated for insubordination.[8] 


Does the summary-judgment evidence raise a genuine issue of
fact as to causation?








The uncontroverted summary-judgment evidence proves many
instances of insubordination by Feng, including: (1) his repeated failure to
provide a medical doctor=s evaluation of his eye problem, (2) his refusal
to work on the procedures for his instruments prior to his alleged eye problem,
(3) his failure to cross-train with Qui when requested to do so, and (4) his
refusal to stay within his job duties and to avoid criticizing Qui=s work and to
avoid telling Zhang how he should perform his duties as supervisor. 
Furthermore, Feng=s subjective beliefs, for example that he
was being retaliated against for protected activity, are not sufficient to
overcome Sabic=s summary-judgment evidence.  See Russo v. Smith
Intern., Inc., 93 S.W.3d 428, 440 (Tex. App.CHouston [14th
Dist. 1999,  pet. denied).  Feng=s conclusory
statements that he was not insubordinate do not raise a genuine issue of
material fact.[9] 
See Coastal Transport Co., Inc. v. Crown Cent. Petroleum Corp., 136
S.W.3d 227, 232 (Tex. 2004) (stating that even unobjected-to conclusory
testimony does not raise a fact issue); Herbert v. City of Forest Hill,
189 S.W.3d 369, 377 (Tex. App.CFort Worth 2006, no pet.).  The
uncontroverted evidence shows that Sabic took seriously Feng=s allegations of
unlawful discrimination and religious harassment, that Sabic investigated Feng=s allegations, and
determined that they lacked merit.  Feng disagreed with these conclusions and
continued to repeat the same allegations and to engage in increasingly
insubordinate behavior.[10]









We have carefully reviewed all of the summary-judgment
evidence in the light most favorable to Feng, crediting evidence favorable to
Feng if reasonable jurors could, and disregarding contrary evidence unless
reasonable jurors could not.  See Mack Trucks, Inc., 206 S.W.3d at 582. 
Based on this review, we have determined that reasonable and fair-minded jurors
could not conclude that Sabic=s proffered reason for Feng=s termination was
a pretext or that Feng=s engaging in the alleged protected
activity was the but-for cause of his employment termination or any other 
adverse employment action.[11] 
See Strong v. Univ. Healthcare Sys., 482 F.3d 802, 807B08 (5th Cir. 2007)
(holding that mere temporal proximity between protected activity and
termination of employment is not enough to raise a fact issue as to but-for
causation requirement in retaliation claim); Pineda, 360 F.3d at 489B90; Swanson,
110 F.3d 1180, 1188B89 & n.3 (5th Cir. 1997); Herbert,
189 S.W.3d at 376B77; Thomas, 2 S.W.3d at 739B40.  Therefore,
the trial court did not err in granting summary judgment.  Accordingly, we
overrule Feng=s appellate issue and affirm the trial court=s judgment.  

 

 

 

/s/      Kem Thompson Frost

Justice

 

Panel
consists of Justices Anderson and Frost and Senior Justice Hudson.* 

 









[1]  Feng cites Burlington Northern & Santa Fe Ry.
Co. v. White for the proposition that whether retaliation has occurred is
always a question for the jury.  See 548 U.S. 53, 70, 126 S. Ct. 2405,
2416, 165 L. Ed. 2d 345 (2006).  The White court did not so hold. See
id.  Rather, the White court addressed the legal standard for
determining whether an employer has Adiscriminated@ against a person who has engaged in protected
activity under the federal statute upon which section 21.055 of the Texas Labor
Code is based.  See id., 548 U.S. at 56B72, 126 S. Ct. at 2408B17.  The White
court concluded that there was sufficient evidence to support the jury=s verdict in favor of the plaintiff on her retaliation
claim in a case in which the employer did not dispute that there was sufficient
evidence that it had a retaliatory motivation in taking the challenged action. 
The White case is not on point. See id., 548 U.S. at 70B72, 126 S. Ct. at 2416B17.  





[2]  Feng cites several cases stating that, when the
adverse employment action occurs shortly after the protected activity, this
temporal proximity alone may be sufficient to provide the causal connection for
the claimant to make out a prima facie case of retaliation.  See Evans v.
City of Houston, 246 F.3d 344, 354 (5th Cir. 2001); Romo v. Texas Dep=t of Transportation, 48 S.W.3d 265, 272B73 (Tex. App.CSan Antonio 2001, no pet.); Fields v. Teamsters
Local Union No. 988, 23 S.W.3d 517, 528B29
(Tex. App.CHouston [1st Dist.] 2000, pet. denied).  Because we
presume that Feng has made out a prima facie case of retaliation, these cases
are not on point.





[3]  Indeed, in his deposition testimony, Feng admitted
that, on the day he was fired, Sabic articulated to him that his employment was
being terminated because he was insubordinate.





[4]  Because his last name is similar to another Sabic
employee, we refer to Qui Nguyen in this opinion by his first name.





[5]  Because his last name is similar to Qui=s, we refer to Andy Nuyen in this opinion by his first
name.





[6]  Feng cites this email as evidence that he completed
a draft of the procedures by August 10, 2005, but this email is no evidence
that Feng completed the document containing procedures for one of his
instruments.  Feng admitted at his deposition that he never completed such a
document.  





[7]  Feng had filed a charge of racial and religious
discrimination with the EEOC on October 22, 2005. The record indicates that
Sabic received notice of this charge on November 10, 2005.





[8]  Feng argues that the evidence is conflicting as to
whether he was terminated for insubordination because of a Sabic memorandum
detailing discussions leading up to the termination of Feng=s employment.  Feng relies on one sentence of the memo
stating that Bughdadi Adid not believe the situation had created any problems
for the workforce as a whole.@  According to
Feng, this sentence shows that Bughdadi, unlike Ellis, did not believe that
Feng=s insubordinate behavior was disruptive to the work
environment.  However, in this sentence Bughdadi addresses the workforce as a
whole, not Feng=s work environment.  According to the memo, Bughdadi
mentioned a concern that Feng might commit a  violent act, and the memo states
that Bughdadi concurred with Ellis=s
assessment of the situation.





[9]  Likewise, Feng made several conclusory statements in
his deposition testimony that Sabic engaged in retaliation against him and that
when he protested about harassment or racial discrimination, Sabic retaliated
and terminated his employment.  These conclusory statements also do not raise a
genuine issue of material fact.  See Coastal Transport Co., Inc., 136
S.W.3d at 232; Herbert, 189 S.W.3d at 377.   





[10]  Before Feng was given the October 6, 2005 letter,
Zhang sent an email to Bughdadi listing the following points that Zhang suggested
for inclusion in the letter: (1) Feng Amade
baseless accusations against colleagues@;
(2) Feng Acreated hostile [sic] working environment@; (3) and Feng Adelayed
in writing analytical procedures.@ 
Feng asserts that this email raises a fact issue as to whether Sabic intended
to retaliate against him for complaining about Qui=s alleged discrimination.  However, nothing in this
email indicates that Sabic was giving Feng the October 6 letter or taking
adverse employment action against him because he complained about
discrimination by Qui.





[11]  Citing his annual performance evaluations, Feng
asserts that before he complained of discrimination, he was viewed by Sabic as
a stellar employee.  However, Feng alleges that his first complaint of
discrimination was on August 24, 2005.  In his last performance review for the
period ending November 15, 2004, Feng received a rating of only Aacceptable,@
which was the middle rating in a five-rating system. The undisputed
summary-judgment evidence shows that Feng engaged in significant insubordinate
behavior between November 15, 2004, and his employment termination on December
9, 2005.  Feng also relies on a preliminary draft of a performance evaluation
for Feng for 2005; however, this evaluation was never completed and does not
raise a fact issue as to pretext.





*  Senior Justice Harvey Hudson sitting by assignment.